**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **Christopher Kraszinski,**<br>**Plaintiff,**<br><br>**v.**<br><br>**Rob Roy Country Club Village Association, sued in their official and individual capacities,**<br><br>**Board of Directors of Rob Roy Country Club Village Association, sued in their official and individual capacities,**<br><br>**Rowell Property Management Inc., sued in their official and individual capacities**<br>**Defendants.** | ) | **No. 17 - CV - 2228**<br><br>**JURY DEMAND**<br><br>**Judge John Robert Blakey** |

**FIRST AMENDED**

**CIVIL RIGHTS COMPLAINT**

NOW COMES, **Christopher Kraszinski**, the above referenced Plaintiff, by his attorneys, Alfred D. Ivy, III, and Jay Kumar, pursuant to 42 U.S.C., § 3601, and for his Complaint against the above referenced Defendants, and in support thereof Plaintiff states as follows:

**JURISDICTION AND VENUE**

1. This is a civil rights action brought pursuant to Title VIII of the Civil Rights Act of 1968, as amended (the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988), 42 U.S.C., § 3601 et seq., and Titles II and V of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134, 12203, as well as Title II's implementing regulation, 28 C.F.R. Part 35. to redress deprivation of

Plaintiff's rights to be free from all forms of discrimination against persons with disabilities.

2. Plaintiff seeks monetary damages under the Fair Housing Act.

3. Plaintiff at all times relevant to this cause of action was a citizen of the United States of America, resident of Cook County, Illinois.

4. Defendant Rob Roy Country Club Village Association, at all times relevant herein, was and is a corporation duly incorporated under the laws of the State of Illinois.

5. At all times relevant herein, Defendants Board of Directors of Rob Roy Country Club Village Association owned, operated, controlled, managed, maintained, supervised and/or were otherwise responsible for the Rob Roy Country Club Village Association located in Cook County, Illinois.

6. Defendant Rowell Property Management Inc. at all times relevant herein, was and is an Illinois corporation duly incorporated under the laws of the State of Illinois.

7. At all times relevant herein, Defendant Rowell Property Management Inc. was and is a supervisory and managing entity that owned, operated, controlled, managed, maintained, supervised, acted as agents for Rob Roy Country Club Village Association and the Board of Directors of Rob Roy Country Club Village Association for profit and/or were otherwise responsible for the Rob Roy Country Club Village Association.

8. Venue is proper under 28 U.S.C. § 1391 because all events or omissions giving rise to the claims alleged herein occurred in this district and because the Defendants are located in Prospect Heights, Cook County, Illinois and Elgin, Kane County, Illinois.

9. This Court has jurisdiction over this action and may grant the relief sought herein pursuant to 28 U.S.C. §§ 1331 and 1345; 42 U.S.C. § 3614(a); 42 U.S.C. §§ 12133 and 12134; and 28 U.S.C. §§ 2201 and 2202.

## FACTUAL BASIS

10. The condominium unit at the nexus of this action, located in Cook County Illinois was purchased by Plaintiff's family in 1985.

11. Said condominium unit is located within a parcel of real property subject to rules and governance promulgated exclusively by defendant association.

12. The association is headed and managed by a Board of Directors (hereinafter "the Board") and property management company, Rowell Property Management Inc. (hereinafter "Rowell", collectively "Defendants").

13. Plaintiff has resided exclusively in the above referenced unit since 1997.

14. Beginning in 1997 and continuing through this date, Plaintiff, by and through his mother began making requests for accommodation from Defendant regarding excessive and frequent application of harmful chemical substances including landscape pesticides and herbicides outside his living unit.

15. Said requests for pesticide and herbicide accommodation were made via frequent written correspondence, telephone communications, and in person during board meetings hosted by Defendant association.

16. Plaintiff's mother, on his behalf, expressed concern that the frequent and liberal application of pesticides and herbicides outside and near their unit could or would have negative effects on the health and development of her child.

17. During this time, Plaintiff was the only child residing on the real property governed by the defendant association, which included 650 condominium units and over 1,000 individual residents.

18. Plaintiff was the youngest homeowner and association member in the association's history, the vast majority of the neighborhood's residents being in retirement age and the Board entirely consisting of members over the age of 65.

19. All of Plaintiff's requests for reduced pesticide and herbicide application and use outside and near his unit were summarily denied.

20. Defendants caused the chemicals and pesticides to be routinely applied under conditions that are deemed unsafe and dangerous, such as under windy conditions via a pressurized hose that would blast the pesticides 20-40 feet into the air, causing "pesticide spray drift" - the airborne movement of pesticides from an area of application to any unintended site - a known health risk and cause of pesticide exposure to people, animals, water sources, plants, and property.

21. Defendants would apply pesticides without informing or in any way attempting to notify Plaintiff about the days of application, thereby making it impossible for Plaintiff to avoid contact with these contaminants.

22. Even if a window was open Defendants would still spray pesticides in the direction of the open window. This caused the penetration of pesticides through Plaintiff's window into his unit.

23. In 2006, Plaintiff became seriously ill and was diagnosed with an auto-immune disorder that limited Plaintiff's ability to engage in major life activities.

24. Following the diagnosis of this debilitating auto-immune disorder, Plaintiff and his mother began increasing the frequency of their requests for accommodation directed to Defendants, pleading that they stop the usage of harmful pesticides.

25. Plaintiff and his mother continued attempts to persuade Defendants to implement more natural and environmentally friendly means of landscaping as a way to accommodate Plaintiff's health condition.

26. Plaintiff's doctors advised him to avoid exposure to chemical and environmental irritants, such as pesticides and herbicides, as such substances could exacerbate his health issues. Consequently, Plaintiff and his mother made additional requests for Defendants to stop the spraying of pesticides as it would exacerbate his disability.

27. From 2006-2009, Plaintiff, along with his mother, presented additional evidence, including clinical studies, scientific research and alternative landscaping methods, along with their requests for pesticide and herbicide accommodation to the defendant association, the Board and Rowell.

28. Defendants denied all of Plaintiff's requests for pesticide and herbicide accommodation with great hostility, and even sending many of Plaintiff's email requests to their Spam folder.

29. In or around 2007, Defendants specifically told Plaintiff and his mother that Defendants would spray more frequently outside and near his unit because the board and Rowell was tired of their frequent requests for accommodation. A representative of Rowell stated to Plaintiff: "I will specifically make sure that the area around your unit is sprayed".

30. As a consequence of Defendants' actions, Plaintiff was no longer able to go outside his residential unit or leave any window open for any length of time due to the severe and adverse reaction his body had to the toxins and chemicals contained in the pesticides and herbicides being applied directly outside and near his residential unit.

31. In 2009, Plaintiff's disease progressed significantly and became completely unmanageable.

32. Plaintiff was informed by his doctors that individuals who have autoimmune conditions must avoid, as much as possible, all environmental toxins including pesticides, allergens and chemicals as these can cause complications and worsening of symptoms.

33. In 2009, Plaintiff began writing letters to Defendants requesting removal of carpeting to accommodate his disability after Plaintiff's doctors informed him that indoor carpeting could aggravate his symptoms. Plaintiff intended to cover all costs associated with the replacement of carpeting

34. In support of Plaintiff, his doctors wrote letters recommending that, in addition to eliminating the pesticide and herbicide use outside and near Plaintiff's residential unit, that Defendants modify their policy to permit Plaintiff to remove the carpeting from his individual unit to aid in his recovery and abatement of environmental allergens and toxins from his home.

35. Plaintiff's doctors explained that carpeting traps and harbors all manner and form of environmental pollutants, allergens and toxins, including pesticides and chemicals carried into the home via personal clothing and footwear.

36. In 2009, the Defendants presented a response letter to Plaintiff and his mother stating that the policies would not change to accommodate his condition.

37. In April 2009, Defendants specifically told Plaintiff and his mother that the board made its decision to force Plaintiff and his mother to move out of the neighborhood and that they were not wanted in the community.

38. The Defendants had orchestrated a plot to evict Plaintiff out of the neighborhood and intended to accomplish this by filing multiple retaliatory and fraudulent lawsuits with the end goal being that "a few thousand dollars will push them [Plaintiff and his mother] over the edge".

39. In 2010 Defendants, after being given notice of Plaintiff's intent to remove carpeting due to his disability, and being made aware of the medical necessity as it related to his health condition, falsely accused Plaintiff of removing carpeting and replacing it with hardwood floors, and subsequently filed a retaliatory state court lawsuit against him in 2010 ostensibly seeking an injunction to inspect Plaintiff's unit.

40. By early 2011 Plaintiff's health began to drastically decline as his auto-immune condition worsened. He suffered from significant involuntary weight loss and blood loss due to internal bleeding. Plaintiff developed a serious state of anemia as his condition deteriorated from a chronic illness to a permanent disability. The Social Security Administration declared Plaintiff permanently disabled.

41. In mid to late 2011, Plaintiff's disability further deteriorated to a severe state of exacerbation that reduced Plaintiff's body weight to a critical 94 pounds, further paralyzing his ability to engage in major life activities and even care for himself. Plaintiff became bedridden and required the 24-hour assistance of a caretaker.

42. After 2012, Plaintiff developed additional severe allergies and disorders that caused him further disability and provided alternative medically necessary reasons to have his

carpeting removed, which he presented to Defendants, who continued to reflexively deny or ignore his requests.

43. Plaintiff did not have a reasonable opportunity to defend himself adequately in the state court lawsuit primarily because of his worsening disability. Plaintiff sought an accommodation from the court seeking an extension of time due to his failing health and required hospitalizations. However, the judge denied him the accommodation. Plaintiff was subsequently unable to participate in the legal proceedings throughout their duration and for the time periods where he would otherwise have been able to appeal, due to the state court's failure to accommodate his disability.

44. Additionally, the judge did not allow him oral argument on his 2-619 Motion to Dismiss a despite the fact that he had a statutory right to one, and thus Plaintiff was deprived of an opportunity to fully participate in the legal proceedings.

45. After the state court judge denied Plaintiff an opportunity to present his 2-619 Motion and then denied his reasonable accommodation requests, Defendants were granted a default judgment against Plaintiff, which awarded them $40,000 for attorney's fees, and an order allowing them to inspect Plaintiff's unit within 14 days.

46. The Defendants never bothered to contact Plaintiff, the unit owner, to arrange the inspection within 14 days, further evidencing Defendants' retaliatory motive in the filing of the lawsuit.

47. In 2013, Plaintiff was hospitalized and treated for the psychological injuries that resulted from continuous chronic stress and trauma brought on by the repeated denials for reasonable accommodations, incessant retaliation, harassment and unremitting mistreatment by Defendants.

48. The discrimination encompassing Fair Housing Act violations created a systemic pattern and practice of abuse that Plaintiff was forced to endure at the hands of Defendants. This continuous abuse-based trauma lead to the psychological breakdown of Plaintiff and decline of his health.

49. Additionally, Plaintiff developed a stress-based cardiovascular condition that was caused by Defendants ongoing failure and refusal to accommodate.

50. Plaintiff was diagnosed with severe mental and psychological injuries requiring hospitalization, with prognosis for recovery deemed poor, and prescribed a counseling and recovery plan, along numerous medications to treat his conditions.

51. Despite all this, Plaintiff made further requests for accommodation to defendants continuously throughout these events, and presented new information of his deteriorating health condition to the board. Plaintiff presented additional health conditions further augmenting the need both for the cessation of harmful pesticide spraying and the removal of the carpeting.

52. Plaintiff's requests were all denied or ignored again.

53. In 2014, Plaintiff was tested by his doctors and diagnosed as being highly allergic to carpeting, dust mites and house dust. Plaintiff is given medications to treat the severe allergic reactions but they offer little help as the source of the allergens, the carpeting, remains present in Plaintiff's unit.

54. Plaintiff again wrote letters to Defendants informing them that carpeting is causing harm to his health and reiterates his requests for reasonable accommodations in light of his new health conditions, which exacerbate his existing disabilities.

55. Plaintiff's doctors wrote letters on behalf of Plaintiff in support of his requests for reasonable accommodations, stating that the removal of carpeting is a medical necessity.

56. Plaintiff was further diagnosed with additional allergic conditions and respiratory disabilities resulting from the carpeted floors present in Plaintiff's unit; he was prescribed an ever increasing number of medications.

57. Plaintiff's disease progressed to the point of permanency and his health no longer has any chance of recovery.

58. Plaintiff's health continues to deteriorate despite intensive treatment and medical care because the root cause of the problem remains unaddressed and ongoing.

59. The Defendants have not presently terminated their practice of spraying pesticides that harm Plaintiff, and continue to harm Plaintiff regularly.

60. The Defendants have not presently terminated their practice of requiring carpeting in their units nor have they terminated their practice of requiring the Plaintiff to possess carpeting, despite knowledge of his disability, which further exacerbates harm to the Plaintiff.

## Count 1 – VIOLATION OF CIVIL RIGHTS PURSUANT TO THE FAIR HOUSING ACT OF 1968, 42 U.S.C., § 3601 (Spraying of Harmful Pesticides)

61. Plaintiff realleges and incorporates by reference paragraphs 1-60 as though they were fully restated herein.

62. Under the Federal Fair Housing Act, as amended in 1988, it is illegal to: (a) make a dwelling unavailable to a person on account of a handicap, 42 U.S.C.A, § 3604(f); or (b)

interfere with persons on account of having exercised their rights, or their having aided or encouraged other persons in the exercise or enjoyment or right, that are granted or protected by 42 U.S.C.A, § 3604(f), 42 U.S.C.A, § 3617.

63. Plaintiff suffers from numerous disabilities including an autoimmune disease and breathing disorder and is disabled or handicapped as defined by federal statute and state law.

64. Since 2009, Plaintiff made frequent and repeated requests for accommodation, including requests to abate pesticide use near his residence, accompanied by letters from his medical doctors, all of which were denied without adequate explanation by Defendants.

65. The replacement of Defendants' spraying of harmful pesticides with a safer form of pest control was an accommodation that was reasonable and medically necessary for Plaintiff to have equal use and enjoyment of his dwelling.

66. As of the date of this filing, Defendants continue to refuse Plaintiff's request for accommodation.The Defendants continue to regularly spray pesticides weekly in areas proximate to Plaintiff's dwelling.

67. If Plaintiff ever leaves his window open, pesticides are sprayed directly into his unit.

68. The 1988 amendments to the Federal Fair Housing Act, by its terms, render invalid any rule or policy that purports to require or permit any discriminatory housing practice. 42 U.S.C.A, § 3615.

69. Defendants' continuous and ongoing refusal to permit Plaintiff to stop the spraying of pesticides near his unit is discriminatory because it serves to make dwellings unavailable

to persons on account of their handicap in violation of the Federal Fair Housing Act, 42 U.S.C.A, § 3604(f) and 42 U.S.C.A, § 3617.

70. Defendants' actions described above constitute a pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, or a denial of rights protected by the Fair Housing Act to a disabled person, which denial raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

71. Defendants' actions described above constitute: discrimination in the sale or rental, or otherwise making unavailable or denying, a dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(1); discrimination in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(2); a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person an equal opportunity to use and enjoy a dwelling, in violation of the FHA, 42 U.S.C. § 3604(f)(3)(B);e. interference with the rights of persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged persons with disabilities in the exercise or enjoyment of rights granted or protected by the FHA, in violation of 42 U.S.C. § 3617.

72. Plaintiff is a victim of Defendants' discriminatory conduct and is an "aggrieved person" within the meaning of 42 U.S.C. §§ 3602(i) and 3614(d)(1)(B), and has suffered harm and damages as a result of Defendants' conduct.

**Count 2 – VIOLATION OF CIVIL RIGHTS PURSUANT TO THE FAIR HOUSING ACT OF 1968, 42 U.S.C., § 3601 (Prohibiting the Removal of Carpeting)**

73. Plaintiff realleges and incorporates by reference paragraphs 1-72 as though they were fully restated herein.

74. The replacement of Plaintiff's carpeting with an alternative, hypoallergenic flooring, is an accommodation that is reasonable and medically necessary for Plaintiff to have equal use and enjoyment of his dwelling.

75. Under the Federal Fair Housing Act, as amended in 1988, it is illegal to: (a) make a dwelling unavailable to a person on account of a handicap, 42 U.S.C.A, § 3604(f); or (b) interfere with persons on account of having exercised their rights, or their having aided or encouraged other persons in the exercise or enjoyment or right, that are granted or protected by 42 U.S.C.A, § 3604(f), 42 U.S.C.A, § 3617.

76. Defendants' continuous and ongoing refusal to permit Plaintiff to remove the carpet in his unit is arbitrary and discriminatory because it serves to make dwellings unavailable to persons on account of their handicap in violation of the Federal Fair Housing Act, 42 U.S.C.A, § 3604(f) and 42 U.S.C.A, § 3617.

77. The first discrete instance of when the Defendants refused to allow Plaintiff to remove his carpeting was in 2009, prior to the initiation of the lawsuit against him. Plaintiff has made continuous requests to remove his carpeting since then and to present day - which Defendants have denied or ignored.

78. After the state court entered a default judgment against Plaintiff allowing the Defendants 14 days to conduct an inspection, Plaintiff was diagnosed with other medical conditions, including a bleeding disorder, which provided additional reasons to have the carpeting removed.

79. Plaintiff subsequently made additional accommodation requests to have the carpeting removed, and presented new medical conditions to the Defendants, which did not exist

before the state court judgment was entered. However, the Defendants still failed to allow Plaintiff to remove the carpeting, in violation of the Fair Housing Act.

80. Further, Defendants' policy regarding floor coverings within individual units is discriminatory on its face because it serves to make dwellings unavailable to persons on account of their handicap in violation of the Federal Fair Housing Act, 42 U.S.C.A, § 3604(f) and 42 U.S.C.A, § 3617.

81. Additionally, Plaintiff lacked a reasonable opportunity to adequately represent his interests regarding carpeting in the state court lawsuit.

82. When Plaintiff was notified of the state court lawsuit filed against him, he was able to afford an attorney to make one 2-619 Motion to Dismiss on his behalf: an Anti-SLAPP motion pursuant to the Citizen Participation Act. The Citizen Participation Act specifies that a hearing must take place if any motion is made pursuant to the Act. 735 Ill. Comp. Stat. Ann. 110/20.

83. Despite the requirement that a hearing must take place for the motion, the judge denied Plaintiff an opportunity to present arguments at a hearing in order to dismiss the lawsuit.

84. Further, after the judge denied the motion and Plaintiff's attorney withdrew, Plaintiff made accommodation requests to the judge for an extension of time due to his failing health and disability.

85. The judge denied his accommodation request, and Plaintiff was subsequently unable to meaningfully participate in the lawsuit for the remainder of the time in which substantive issues were litigated, and for the period in which he could have appealed the default judgment which was consequently entered against him.

86. Plaintiff was therefore deprived of a reasonable opportunity to present or raise any Fair Housing Act related defenses or counter-claims related to carpeting that may be inextricably intertwined with the state court matter.

87. The default judgment the Defendants obtained granted them an injunction to inspect Plaintiff's unit within 14 days, and for Plaintiff to make his flooring in compliance with the by-laws if the inspection determined that Plaintiff was in violation of the by-laws.

88. However, the Defendants did not contact Plaintiff, the unit owner, to arrange such an inspection within 14 days of the state court's order being written. Plaintiff does not bring this federal action to dispute that the Defendants were entitled to inspect his unit within 14 days of the state court order being written.

89. Alternatively, because Defendants failed to inspect Plaintiff's unit within the time required by the state court order, they waived their right to enforce wall-to-wall carpeting in Plaintiff's unit.

**Count 3 – RETALIATION UNDER THE FAIR HOUSING ACT OF 1968, 42 U.S.C., SECTION 3601**

90. Plaintiff realleges and incorporates by reference paragraphs 1-89 as though they were fully restated herein.

91. This count arises out of and was solely caused by Defendants' actions that are independent of any state court ruling. All damages were caused by and directly originate exclusively from Defendants acts and are independent of any other factors not related to Defendants' conduct.

92. After Plaintiff and his mother made requests for the Defendants to stop the spraying of pesticides that aggravated his disability, the Defendants began a campaign of continuous and retaliatory harassment beginning in the early 2000s and persisting until present day.

93. This campaign of retaliatory harassment consisted of countless discrete acts that were part of a concentrated effort to force Plaintiff out of his home in retaliation for the persistent reasonable accommodation requests.

94. In 2010, following Plaintiff's repeated and frequent requests for accommodation to stop the spraying of pesticides and to remove his carpeting, Defendants filed a retaliatory lawsuit against Plaintiff seeking an injunction to inspect his unit, faking concern over his flooring, in order to harass Plaintiff, burden him with legal expenses, with the ultimate purpose of forcing him to move out.

95. The Defendants had never before filed a lawsuit seeking an injunction to inspect a homeowner's unit in order to enforce its by-laws. The Defendants filed the lawsuit because of the Plaintiff's disability and because of his accommodation requests.

96. The retaliatory lawsuit was just one discrete act of retaliation among a continuous series of retaliatory acts continuing until present day. The retaliatory conduct began prior to the Defendants filing the state court lawsuit against Plaintiff. Subsequent retaliatory conduct occurred continuously during and after the default judgment was entered against Plaintiff. This subsequent retaliatory conduct was separate and apart from the enforcement of the judgment against Plaintiff.

97. The state court judge did not, at any time, authorize Defendants to retaliate against Plaintiff for making further reasonable accommodation requests by issuing him arbitrary fines, verbally harassing him, or vandalizing his property after the judgment was entered.

98. Defendants continued to retaliate against Plaintiff after the judgment was entered against him with conduct that was separate from collection attempts on their judgment. Not only did they deny subsequent accommodation requests both to stop the spraying of harmful pesticides and allow him to remove his carpeting, but they arbitrarily fined him and his mother, subjected him to verbal harassment, and vandalized his property.

99. Defendants engaged in the above retaliatory conduct specifically because Plaintiff had made, and continued to make, reasonable accommodation requests under the Fair Housing Act to stop the spraying of pesticides and to remove carpeting.

100. After Plaintiff started making his requests for accommodation, Defendants began assessing fines to Plaintiff numerous times for alleged violations that were both trivial and were not assessed on other unit owners throughout around 2009 and continuing to present day.

101. In July 2017, after the filing of this presently pending federal action, and in retaliation for it, Defendants again acted in retribution against Plaintiff for having exercised his protected Fair Housing rights by targeting his personal property including certain organic therapeutic plants being grown on Plaintiff's balcony. These items of personal property and therapeutic plants where being implemented in Plaintiff's treatment and in aid of his disability.

102. Defendants undertook the above actions, and countless other adverse actions continuing until present day, against Plaintiff precisely because he made multiple requests for accommodation under the Fair Housing Act as to give rise to a reasonable inference of retaliation for Plaintiff's lawful exercise of his rights.

103. As of the date of this filing, Defendants acted and continue to act intentionally, willfully, and in disregard for the rights of Plaintiff and other similarly situated persons.

104. Defendants' actions described above constitute a pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, or a denial of rights protected by the Fair Housing Act to a disabled person, which denial raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

105. Defendant's actions described above constitute: discrimination in the sale or rental, or otherwise making unavailable or denying, a dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(1);discrimination in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(2); a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person an equal opportunity to use and enjoy a dwelling, in violation of the FHA, 42 U.S.C. § 3604(f)(3)(B);e. interference with the rights of persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged persons with disabilities in the exercise or enjoyment of rights granted or protected by the FHA, in violation of 42 U.S.C. § 3617.

## Count 4 – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

106. Plaintiff realleges and incorporates by reference paragraphs 1-101 as though they were fully restated herein.

107. Defendants have engaged in a continuous series of discrete acts designed to harass Plaintiff and his mother into moving out of his home, beginning since the early 2000s until present day.

108. Defendants' campaign of extreme and outrageous harassment began prior to the initiation of the lawsuit, but also included the filing of the retaliatory lawsuit, as well as other continuing harassment separate and apart from the collection attempts related to the state court judgment.

109. Defendants knew that if it engaged in this campaign of harassment against Plaintiff and his mother, Plaintiff would have to face significant financial, physical, and psychological difficulties, as Defendants had been previously informed of the severe nature of Plaintiff's medical conditions.

110. Defendant's acts of continuous retaliation and harassment against Plaintiff caused and continue to cause extreme stress, fear, and an accelerated decline in his health, requiring Plaintiff to undergo extensive psychiatric treatment.

111. Plaintiff has been living in fear of becoming homeless and has received unwarranted threats from Defendants ranging from notices and fines for non-existent or trivial violations to numerous acts of vandalism of personal property, as well as extreme verbal harassment accompanied by threats of physical harm.

112. Defendants' continuous conduct designed to force Plaintiff from his home is the cause of Plaintiff's emotional distress.

113. Defendants' conduct was and continues to be a calculated plan to cause Plaintiff physical and emotional harm.

114. The emotional distress Plaintiff suffered at the hands of Defendants has been so severe that it placed Plaintiff's life in danger.

115. Defendants intended to cause or recklessly or consciously disregarded the probability of causing emotional distress, as they had knowledge of Plaintiff's medical and psychological vulnerabilities when they engaged in their harassment.

116. Defendants' conduct actually and proximately caused the plaintiff's injuries, damages and emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, **Christopher Kraszinski,** Plaintiff respectfully requests that this Honorable Court review his claims and enter orders that:

A. Defendants be served by the U.S. Marshall, or other competent entity legally authorized to serve process in the State of Illinois, and be ordered to file an answer within the time allotted by law.

B. Judgment be rendered in favor of Plaintiff and against Defendants on all counts asserted herein.

C. Declare that Defendants' actions violate the Fair Housing Act, the Federal Fair Housing Amendments Act of 1988

D. Enjoin Defendants, their officers, employees, agents, successors and all other persons in active concert or participation with it, from enforcing the Defendants' rules that unfairly infringe upon the rights of reasonable enjoyment of persons with disabilities;

E. Enjoin Defendants, their officers, employees, agents, successors and all other persons in active concert or participation with it, from enforcing the Defendants' rules in a manner that discriminates because of disability in violation of the Fair Housing Act and the Americans with Disabilities Act;

F. Order Defendants to take all affirmative steps to ensure its compliance with the Fair Housing Act, including steps necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate to the extent practicable the effects of its unlawful housing practices as described herein;

G. Order Defendants to take all affirmative steps to restore, as nearly as practicable, the victims of the Defendants' unlawful practices to the position they would have been in but for the Defendants' discriminatory conduct;

H. Award monetary damages, pursuant to the FHA, 42 U.S.C. § 3614(d)(1)(B), and the ADA, 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. Part 35, to all aggrieved persons.

I. Plaintiff be awarded compensatory damages for his physical injuries, pain and suffering and mental anguish.

J. Plaintiff be awarded punitive damages against Defendants.

K. Plaintiff be awarded reasonable expenses incurred in this litigation, including his reasonable attorney's fees, expert fees, costs of suit and other reasonable litigation expenses, pursuant to 42 U.S.C., Section 1988(b) and (c).

L. Plaintiff receive any such additional relief as the interests of justice may require and any other relief to which he may be entitled.

M. Plaintiff be granted a jury trial in this matter.

Respectfully submitted
**Christopher Kraszinski**, Plaintiff

s/ Alfred D. Ivy, III
Alfred D. Ivy, III - Attorney for Plaintiff

s/ Jay Kumar
Jay Kumar - Attorney for Plaintiff


| | |
|---|---|
| Alfred D. Ivy, III, #6277701<br>Attorney for Plaintiff<br>159 Lincoln Square<br>300 S. Broadway Ave.<br>Urbana, Illinois 61801<br>(217) 480-4893 cell<br>lawmba1@gmail.com | Jay Kumar, #60100<br>Jay Kumar Law<br>Attorney for Plaintiff<br>208 S. Jefferson St. #204<br>Chicago, Illinois 60661<br>(312)-767-7903<br>jay@jaykumarlaw.com |