### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Christopher Kraszinski, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | No.    17 - CV - 2228 |
| | ) | |
| Rob Roy Country Club Village | ) | |
| Association, sued in their official | ) | JURY DEMAND |
| and individual capacities, | ) | |
| | ) | Judge John Robert Blakey |
| Board of Directors of Rob Roy | ) | |
| Country Club Village Association, | ) | |
| sued in their official and | ) | |
| individual capacities, | ) | |
| | ) | |
| Rowell Property Management Inc., | ) | |
| sued in their official and individual | ) | |
| capacities | ) | |
|     Defendants. | ) | |

## <u>THIRD AMENDED</u>
## <u>CIVIL RIGHTS COMPLAINT</u>

NOW COMES, **Christopher Kraszinski**, the above referenced Plaintiff, by his attorneys, Alfred D. Ivy, III, and Jay Kumar,  pursuant to 42 U.S.C.,  § 3601, and for his Complaint against the above referenced Defendants, and in support thereof Plaintiff states as follows:

## <u>INTRODUCTION</u>

1. Plaintiff brings this action to protect the health, safety and welfare of his person and environment.

2. The environment has a profound influence on all manner of life, including humans.

3. Individuals with certain handicaps and disabilities can be more susceptible and be greatly affected by their surrounding environments, often times even more so than their healthy counterparts.

4. As a result, persons with disabilities often times require certain accommodations and modifications to their environment in order to be able to better cope with and alleviate the difficulties of living with a disability.

5. Due to the profound effects that a person's environment has on one's health and well-being, these accommodations and modifications are deemed to be federally protected human rights.

6. Depending on the individual circumstances and situation, certain factors in one's environment can either alleviate, worsen or even cause the disability.

7. Among the most influential and determining factors present in the environment that affect the health of humans are: pesticides.

8. There is a great body of evidence, encompassing a wide array of scientific studies from major academic research institutions and numerous statements from national and international health protection agencies on the harmful effects of pesticides on human health.

9. A study conducted by the Immunotoxicological Branch, Experimental Toxicology Division of the National Health and Environmental Effects Research Laboratory, Office of Research and Development of the United States Environmental Protection Agency (EPA), published in the International Journal of Human and Ecological Risk Assessment, Volume 8, Issue 2 - 2010 found that: "The immunotoxic potential of insecticides and herbicides has subsequently been studied extensively in laboratory animals, driven by the global distribution and use of these chemicals. (Ten of the twelve persistent organic pollutants, identified by the United Nations Environmental Program as posing the

greatest threat to humans and wildlife, are pesticides; all have been reported to alter immune function under laboratory conditions)".

10. The World Health Organization (WHO) states that: "By their nature, pesticides are potentially toxic to other organisms, including humans… pesticides may have acute and/or chronic toxic effects, and pose particular risk to children."

11. The Mount Sinai School of Medicine, Children's Environmental Health Center states: "Pesticides used on lawns and gardens are designed to be toxic to unwanted pests. As a result, they can also be harmful to humans. While many pesticides are advertised as "safe", a large body of evidence suggests otherwise. Because pesticides are particularly harmful to children, we advocate against their use for cosmetic and routine lawn care in residential and public spaces. All pesticides have the potential to be toxic to humans." Additionally: "Children are at highest risk for exposure due to their proximity to the ground where pesticides settle and their age-appropriate hand-to-mouth behaviors. Their higher breathing rates also increase risk of exposure compared with adults. Outdoor pesticides are tracked into our homes on shoes, strollers, and the bodies of children who run and play in pesticide treated areas. Many classes of pesticide exert their effects by damaging the nervous system of a pest. Due to similarities across species, these pesticides have also been shown to be toxic to the nervous system of humans. Several pesticides are classified as Endocrine Disrupting Chemicals (EDCs) due to their potential to interfere with hormones in the body. Disruption of hormonal systems can impair the development and normal functioning of the reproductive system as well as the nervous system, particularly when exposure occurs early in life. Glyphosate, the active ingredient in some pesticides is classified as a probable human carcinogen by the World Health Organization. Pesticides are associated with impaired lung function, asthma, and other respiratory diseases."

12. Furthermore, doctors at the Icahn School of Medicine at Mount Sinai have advised: "To reduce exposure to potentially harmful lawn and garden pesticides, eliminate pests naturally by: practicing organic lawn care see beyondpesticides.org for tips and

perfectearthproject.org to learn how easy it is to maintain a beautiful organic lawn…
Encouraging friends and neighbors to reduce the use of pesticides. Pesticides can cross
property lines."

13. Additionally, the commonly used lawn care chemical 2,4-D (2,4-Dichlorophenoxyacetic
acid) was one of the highly toxic chemicals used in "Agent Orange" during the Vietnam
War. It has been found to be toxic to the immune system, nervous system, is a known
endocrine disruptor and has been classified as a possible human carcinogen by the
International Agency for Research on Cancer (IARC) of the World Health Organization
of the United Nations.

14. There is insurmountable and indisputable evidence of the detrimental health risks of
pesticides especially to the immune system as well as their effects on genotoxicity. In
numerous clinical studies and findings published in countless peer-reviewed journals
have shown that pesticides inhibit and dysregulate certain gene receptors and can even
permanently damage and alter human DNA. A study published in the Journal of
Toxicology Mechanisms and Methods, Volume 25, Issue 4, 2015 titled *A comprehensive
review of pesticides and the immune dysregulation: mechanisms, evidence and
consequences*, has found: "Reports indicate that during environmental or occupational
exposure, pesticides can exert some intense adverse effects on human health through
transient or permanent alteration of the immune system. There is evidence on the relation
between pesticide-induced immune alteration and prevalence of diseases associated with
alterations of the immune response. In the present study, direct immunotoxicity,
endocrine disruption and antigenicity have been introduced as the main mechanisms
working with pesticides-induced immune dysregulation. Moreover, the evidence on the
relationship between pesticide exposure, dysregulation of the immune system and
predisposition to different types of psychiatric disorders, cancers, allergies, autoimmune
and infectious diseases are studied."

15. Additionally, a report from the World Resources Institute in Washington D.C. found that:
"Many pesticides affect the human immune system in ways that suppress the normal

immune responses to invading viruses, bacteria, parasites and tumors. Based on accepted tests for immunotoxicity, evidence has accumulated from many laboratory experiments on various mammals and human cells exposed to widely used categories of pesticides. These epidemiological studies link pesticide exposure to immune system changes… Some also find elevated risk for infectious diseases or of certain cancers typical of immunosuppressed patients."

16. The outdoor environment is not the only area of concern that poses a health risk to humans and affects people with disabilities; the indoor environment is equally as important. Even if not used indoors, pesticides can and are easily transported to the indoor environment where they routinely become absorbed and deposited into carpeting.

17. Scientific evidence demonstrates that carpeting accumulates and harbors all manner and form of environmental pollutants, allergens and toxins, including pesticides and chemicals carried into the home via personal clothing and footwear.

18. In and of itself, carpet contains various toxic compounds and chemicals that can be harmful to humans, especially persons with certain disabilities. This has been verified by numerous clinical and peer reviewed studies. As a result, people with certain disabilities are advised to not have carpeting within their indoor living environment.

19. The statement on carpets by the American Lung Association, December 7, 2017 holds that: "Carpets may trap pollutants like dust mites, pet dander, cockroach allergens, particle pollution, lead, mold spores, pesticides, dirt and dust. Toxic gases in the air can stick to small particles that settle into carpets. These pollutants may become airborne during renovations, vacuuming or even daily activities like walking on the carpet. In the home, children are more likely to be exposed to pollution in carpets. They spend time playing on the floor and place their hands in their mouths. If a large area is covered in carpet, it may be very difficult to remove indoor air pollutants and allergens. Chemicals used in some new carpets, carpet pads and the adhesives used to install them can harm your health. Some of these chemicals and glues are made with volatile organic

compounds (VOCs), which emit odors and pollutants. New carpet installation also has been associated with wheezing and coughing in babies in their first year of life."

20. Additionally, the US Environmental Protection Agency (EPA) states that: "Carpet also acts as a reservoir for dust, dirt, pollen, mold spores, pesticides and other materials which may originate indoors or be brought into the indoor environment from outside… carpet can release significant quantities of particles into the air during the course of daily activity… If covering a large surface area, carpet and other fabrics can act as "sinks" for the adsorption of VOCs from other sources (during application of paint and other finish coatings, for example) and re-emit them later."

21. The Journal of the British Society for Allergy and Clinical Immunology, Volume 24, Issue 9, 1994 found that: "Mite allergen concentrations in dust from carpeted floors were 6–14 times higher than in dust from smooth floors." Volume 35, Issue 2, 2005: "Higher concentrations of allergens consistently found in carpets compared with smooth floors. Carpet vacuuming seems to remove larger particles but not the allergen-associated smaller particles whereas smooth floor cleaning appears more efficient regarding removal of these smaller particles." Volume 33, Issue 9, 2003: "Installation of carpets caused an increased exposure to allergens from house dust mites. Removal of carpets significantly reduced the levels of both mite allergens and ergosterol, a cell wall component of molds."

22. Additionally, the International Journal of Environmental Research and Public Health, published in February 2018 found that: "recent data support that carpets may act as a repository for pollutants which may become resuspended upon activity in the carpeted area… studies have supported an association between the use of carpets and adverse health outcomes… pollutants such as dirt, dust particles, allergens and other biological contamination can build up in the carpets. Such pollutants may be processed, released and provide new exposure at a later time point... carpets may emit volatile organic compounds (VOCs) that can cause smell and irritation of mucous membranes, especially in sensitive individuals."

23. A study published in the Journal of Occupational and Environmental Hygiene, April 2006 discovered: "Significantly higher concentrations of allergens from house dust mites have been reported in rooms with carpet floors no matter how the carpets were made compared to hard/smooth floors."

24. Furthermore the Division of Intramural Research, National Institute of Environmental Health Sciences, National Institutes of Health, MD, USA - Journal of Allergy and Clinical Immunology, 2005 documented: "Levels of several antigens were statistically higher on carpet than on hard surfaced flooring. For dog and cat allergens, the differences were clinically significant, with mean levels on hard floors being well below proposed thresholds for allergic sensitization."

25. Several peer reviewed studies conducted by the Institute for a Sustainable Environment, Clarkson University, Potsdam, NY, USA and published in the Journal Indoor Air, Volume 24, Issue 6, March 2014 found: "For particle size 3.0–10.0 μm, carpets exhibited higher resuspension fractions compared with hard floorings. The results support that people sensitive to allergens could select hard floorings to reduce exposure and adverse health outcomes." Volume 9, Issue 3, 1999: "Reversible intervention study. Pollution source was a 20 years old carpet. Removal of pollution source resulted in increased satisfaction with perceived indoor air, reduced prevalence of headaches and significantly faster typing of text. Reducing the pollution load was effective in improving comfort, health and productivity."

26. A study published in the International Journal of Environmental Studies, Norbäck et al. 1989, uncovered the following: "Personnel in schools with wall-to-wall carpet reported increased prevalence of eye and airway symptoms, face rashes, headache and abnormal tiredness compared with those in schools with hard floors. Removal of carpets caused several symptoms to decrease. Frequency of airway symptoms remained increased in the carpet group."

27. Recent finding documented in the Journal of the Association for the Care of Asthma,

Volume 52, Issue 7, 2015, revealed: "Hospital-based case-control study. Carpeted floors in the bedroom associated with increase in asthma readmissions (OR = 4.07, 95% CI 1.03–16.06). In the home, frequent vacuuming using bagged cleaners increased risk of asthma readmission OR = 15.7 (95% CI 2.82-87.2)."

28. Studies published in Thorax, Journal of the British Thoracic Society, Volume 60(11), November 2005 state: "Wall to wall carpets in the bedroom were negatively associated with cough with phlegm, chronic cough, and attacks of dyspnoea."

29. Further evidence of the proinflammatory effects of carpeted floors were published in Journal of Pediatric Allergy and Immunology, Volume 20, Issue 6, August 2009, Herberth et al.: "Blood sampling, inflammatory markers. Within a birth cohort study, blood samples of 6 year old children were analysed for concentration of inflammatory markers. Increased levels of inflammatory markers were related to renovation activities, in particular, new floor covering. Among floor covering materials only wall-to-wall carpets were associated with elevated IL-8 and Monocyte Chemoattractant Protein-1 (MCP-1) levels. No association between the single renovation activities painting and furnishing and blood concentration of inflammatory markers has been found. Our data shows that IL-8 and MCP-1 may be suitable markers for monitoring inflammatory reactions in relation with renovation activities. Among renovation activities floor covering seems to induce the strongest inflammatory reactions."

30. Scientific reports published in Toxicology in Vitro, Elsevier - Journal of the European Society of Toxicology and American Association for Cellular and Computational Toxicology, Allermann et al. December 2006 found: "In vitro study. The inflammatory potency of floor dust from carpet was measured as interleukin-8 secretion from the lung epithelial cell line A549 after exposure to dust. Carpet flooring may act as a "sink" for microorganisms resulting in a higher inflammatory potency of floor dust."

## JURISDICTION AND VENUE

31. This is a civil rights action brought pursuant to Title VIII of the Civil Rights Act of 1968, as amended (the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988), 42 U.S.C., § 3601 et seq., and Titles II and V of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134, 12203, as well as Title II's implementing regulation, 28 C.F.R. Part 35. to redress deprivation of Plaintiff's rights to be free from all forms of discrimination against persons with disabilities.

32. Plaintiff seeks declaratory and injunctive relief, monetary damages, punitive damages and civil penalties against the Defendants, under the Fair Housing Act, of a sum in excess of Seventy-Five Thousand Dollars ($75,000.00).

33. Plaintiff at all times relevant to this cause of action was a citizen of the United States of America, resident of Cook County, Illinois.

34. Defendant Rob Roy Country Club Village Association, at all times relevant herein, was and is a corporation duly incorporated under the laws of the State of Illinois.

35. At all times relevant herein, Defendants Board of Directors of Rob Roy Country Club Village Association owned, operated, controlled, managed, maintained, supervised and/or were otherwise responsible for the Rob Roy Country Club Village Association located in Cook County, Illinois.

36. Defendant Rowell Property Management Inc. at all times relevant herein, was and is an Illinois corporation duly incorporated under the laws of the State of Illinois.

37. At all times relevant herein, Defendant Rowell Property Management Inc. was and is a supervisory and managing entity that owned, operated, controlled, managed, maintained, supervised, acted as agents for Rob Roy Country Club Village Association and the Board

of Directors of Rob Roy Country Club Village Association for profit and/or were otherwise responsible for the Rob Roy Country Club Village Association.

38. Venue is proper under 28 U.S.C. § 1391 because all events or omissions giving rise to the claims alleged herein occurred in this district and because the Defendants are located in Prospect Heights, Cook County, Illinois and Elgin, Kane County, Illinois.

39. This Court has jurisdiction over this action and may grant the relief sought herein pursuant to 28 U.S.C. §§ 1331 and 1345; 42 U.S.C. § 3614(a); 42 U.S.C. §§ 12133 and 12134; and 28 U.S.C. §§ 2201 and 2202.

40. This Court retains full jurisdiction as there have not been any state court rulings that in any way impact the jurisdictional authority of this Court on the claims and causes of action being alleged hereinafter. Neither does the relief Plaintiff seeks in any way impact this Court's jurisdiction.


## LIMITATION ON ALLEGATIONS

41. The allegations in this pleading are made pursuant to Federal law. Plaintiff does not seek this Court to overturn or review any previous state court decisions, no matter how erroneous they may be.

42. Plaintiff presents independent causes of action that arise out of and were solely caused by Defendants' actions, their continued patterns and practices, continuing unlawful acts and conduct resulting in continuing and repeated injuries, that are independent of any state court ruling, including Defendants' acts of fraud, retaliation, refusal to accommodate in violation of state and federal anti-discrimination laws and having retaliated against Plaintiff for having pursed his protected Fair Housing rights.

43. All damages claimed hereinafter were caused by and directly arise out of Defendants'

actions, their continued unlawful patterns and practices, and are independent of any other factors not related to Defendants' conduct.

44. The state court did not take into consideration any of these claims as they are independent of the state court default and the state court did not rule upon any of these issues. These claims entail issues the state court did not address or remedy.

45. Plaintiff does not seek this Federal Court to review the state court default, instead Plaintiff seeks this court to award damages for Defendants' ongoing unlawful acts of discrimination against a protected class.


**<u>FACTUAL BASIS</u>**


46. The condominium unit at the nexus of this action, located in Cook County Illinois was purchased by Plaintiff's family in 1985.

47. Said condominium unit is located within a parcel of real property subject to rules and governance promulgated exclusively by defendant association.

48. The association is headed and managed by a Board of Directors (hereinafter "the Board") and property management company, Rowell Property Management Inc. (hereinafter "Rowell", collectively "Defendants").

49. Plaintiff has resided exclusively in the above referenced unit since 1997.

50. Beginning in 1997 and continuing through this date, Plaintiff and his mother began making requests for accommodation from Defendants regarding excessive and frequent application of harmful chemical substances including landscape pesticides and herbicides outside his living unit.

51. Pesticides are toxic to plants, animals, and humans. Many have been found to be carcinogenic, immune system disruptors and hormone dysregulators that damage various body systems and organs.

52. Said requests for pesticide and herbicide accommodation were made both via frequent written correspondence, by telephone communications and in person during board meetings hosted by Defendants.

53. In those requests, Plaintiff and his mother presented numerous scientific papers, research materials and clinical studies on the negative health consequences of using pesticides, especially their potential harmful effects on children.

54. Plaintiff's mother, on his behalf, expressed concern that the frequent and reckless application of pesticides and herbicides outside and near their unit could or would have negative effects on the health and development of her child.

55. Plaintiff, then a 12 year old child, wrote letters to defendants pleading that they stop pesticide usage around his unit stating: "I am 12 years old I want to live long and enjoy my life, please do not ruin it my exposing me unnecessarily to toxic chemicals."

56. In response to these requests, Defendants retaliated against Plaintiff by instructing landscape contractors to destroy an organic garden Plaintiff, then a 12 year old child, was growing and attending to. Plaintiff was the only individual whose garden was destroyed, no other residents in the neighborhood were targeted in this way.

57. Plaintiff was confined to grow his organic garden only on his 2nd story balcony. Defendants would routinely send landscape contractors to drench Plaintiff's balcony and plants with pesticides.

58. During this time, Plaintiff was and/or is believed to have been the only child residing on the real property governed by the Defendants, which included 650 condominium units

and over 1,000 individual residents.

59. Plaintiff was the youngest homeowner and association member in the association's history. A vast majority of the neighborhood's residents being in retirement age and the Board was entirely consisting of members over the age of 65.

60. All of Plaintiff's requests for reduced pesticide and herbicide application and use outside and near his unit were summarily denied.

61. The pesticides and herbicides Defendants were using did actual harm to the grass, trees, and plants, as there would routinely be evident areas of "burnout" from excessive pesticide applications that caused the vegetation to die, especially around Plaintiff's unit.

62. Defendants caused the chemicals and pesticides to be routinely applied under conditions that are deemed unsafe and dangerous, such as under windy conditions via a pressurized hose that would blast the pesticides 20-40 feet into the air, causing what is know as "pesticide spray drift" - the airborne movement of pesticides from an area of application to any unintended site - a known health risk and cause of pesticide exposure to people, animals, water sources, plants and property.

63. Defendants would apply pesticides without informing or in any way attempting to notify Plaintiff about the days of application, thereby making it impossible for Plaintiff to avoid contact with these contaminants.

64. Even if a window was open Defendants wouldn't abate from spraying of the pesticides in the direction of said open window. Causing the penetration of pesticides through Plaintiff's window into his unit and onto the carpeting.

65. Defendants would routinely apply pesticides while possessing knowledge of adverse atmospheric conditions, temperature inversion and applying pesticides even during precipitation, ensuring the likelihood of contamination via runoff and particle drift.

66. Defendants knowingly applied pesticides near and directly onto resident units, balconies, patios, open windows, air conditioning units, walkways, driveways, near storm drains, drainage ditches, in vicinity of pedestrians, in the presence of children, onto parked automobiles, among others.

67. Defendants failed to ensure that the pesticides they were using were safe and not damaging to the health of Plaintiff, the residents or other living beings.

68. Defendants failed to ensure that the pesticides were being applied correctly as to not pose a health and safety hazard to Plaintiff and other residents or damage to property.

69. Defendants placed the subjective cosmetic appearance of the lawn as a higher priority than the safety, health and well-being of Plaintiff and other residents.

70. Defendants placed their personal prejudices, motives and agendas as determining factors for their conduct instead of maintaining integrity to act in the best interest of Plaintiff and other residents of the neighborhood.

71. In 2006, Plaintiff became seriously ill and was diagnosed with an auto-immune disease that severely limited Plaintiff's ability to engage in major life activities.

72. Plaintiff's doctors advised him to avoid exposure to chemical and environmental irritants, such as pesticides and herbicides, as these substances could exacerbate his health issues.

73. Following this diagnosis, Plaintiff and his mother increased the frequency of their requests for accommodation directed to Defendants, pleading that Defendants stop the usage of pesticides near their residence as the exposure to pesticides aggravated Plaintiff's condition.

74. One of Defendants' responses was to inform Plaintiff and his mother that Defendants

would, in fact, increase the intensity of their spraying outside and near their unit.

75. A representative of Defendants stated: "I will specifically make sure that the area around your unit is sprayed".

76. From 2006-2009, Plaintiff, along with his mother, presented additional evidence, including clinical studies, scientific research and alternative landscaping methods, along with their requests for pesticide and herbicide accommodation to the defendant association, the Board and Rowell Property Management Inc.

77. Plaintiff and his mother attempted to persuade Defendants to implement more natural and environmentally safe methods of landscaping as a way to accommodate Plaintiff's health condition and protect the environment.

78. Plaintiff and his mother presented research materials of the benefits of natural and organic methods of landscaping including evidence demonstrating that not only is the natural method proven to be safe and even more effective, but also greatly reduces the cost of operating expenses.

79. Defendants denied all of Plaintiff's requests for accommodation with great hostility, and even took the added step of sending all of Plaintiff's written requests directed to its "spam folder".

80. In or around 2009, Defendants again told Plaintiff and his mother that Defendants would spray more frequently outside and near his unit because the Board and Rowell was tired of their frequent requests for accommodation.

81. As a consequence of Defendants' actions, Plaintiff was no longer able to go outside his residential unit or leave any window open for any length of time due to the severe and adverse reaction his body had to the toxins and chemicals contained in the pesticides and herbicides being applied directly outside and near his residential unit.

82. Plaintiff notified Defendants of the effects the pesticides were having on his health condition and how they were impacting him both physically and psychologically. Defendants were notified how the actions of Defendants were causing extreme stress for Plaintiff.

83. In 2009, Plaintiff's disease progressed significantly, became completely unmanageable and left him bedridden for weeks at a time.

84. Plaintiff was informed by doctors and clinical studies that individuals who have autoimmune conditions must avoid, as much as possible, all environmental toxins including pesticides, allergens and chemicals as these can cause complications and worsening of symptoms.

85. In 2009, Plaintiff wrote letters to Defendants requesting permission for removal of carpeting to accommodate his disability after Plaintiff's doctors informed him that chemicals tracked onto indoor carpeting could exacerbate his auto-immune symptoms. Plaintiff intended to cover all costs associated with the replacement of carpeting, thereby there would be no financial burden placed on Defendants, and no reason whatsoever not to accommodate Plaintiff.

86. In support of Plaintiff, the doctors recommended that, in addition to eliminating the pesticide and herbicide use outside and near Plaintiff's residential unit, that Defendants modify their policy to permit Plaintiff to remove the carpeting from his individual unit to aid in his recovery and abatement of environmental allergens and toxins from his home.

87. Scientific evidence demonstrates that carpeting accumulates and harbors all manner and form of environmental pollutants, allergens and toxins, including pesticides and chemicals carried into the home via personal clothing and footwear.

88. In April 2009, Defendants responded to Plaintiff and his mother via letter stating that no

policies would be changed to accommodate his condition.

89. In April 2009, Defendants specifically told Plaintiff and his mother that Defendants made the decision to force Plaintiff and his mother to move out of the neighborhood and that they were no longer wanted in the community.

90. Plaintiff requested MSDS (material safety data sheets) for the pesticides and herbicides, however, instead of being provided these documents, he was denied the right to them by Defendants and was specifically informed that Defendants intend to block Plaintiff's right to this information.

91. In 2010, Defendants, via certified mail, sent a formal 10-day demand for eviction and possession of the unit owned and occupied by Plaintiff in retaliation for his numerous requests for accommodation.

92. The object of the served notice to quit possession was Plaintiff because that is precisely what Defendants had said.

93. After being given notice of Plaintiff's intent to remove carpeting due to his disability, and being made aware of the medical necessity as it related to his health condition, Defendants falsely accused Plaintiff of removing carpeting and replacing it with hardwood floors, despite being sent 12 photographs of carpeting in Plaintiff's unit that clearly showed the presence of wall-to-wall carpeting in all rooms of said unit.

94. Defendants subjected Plaintiff and his mother to belittlement while making a mockery of Plaintiff's disability through the way they disregarded Plaintiff's needs and how they retaliated against him each time he was taking action in furtherance of his rights.

95. Defendants demanded retaliatory inspection that was moot from its inception because state and federal anti-discrimination law made this issue irrelevant. The inspection demand served no purpose other than harassment, intimidation, humiliation and

retaliation to make Plaintiff further feel unwanted in the neighborhood and assert dominance over Plaintiff and his mother and bully them into submission. Given the specific set of facts and circumstances of the situation, and to illustrate an analogous example, Defendants had as much right to demand an inspection as would an employer approaching an employee and demanding that she pull up her skirt if she wants to keep her job.

96. Defendants attempted to distract from the true issue at hand. They intended to redirect attention to an irrelevant delusion that was proven did not exist and they knew was a lie. They attempted to shift the focus from reasonable accommodations to a non-existing violation of policy - a tactic frequently employed by Defendants in the past.

97. In 2010, Defendants subsequently implemented yet another extension of their unlawful plot to defraud and retaliate against Plaintiff and his mother this time in the form of a meritless lawsuit, filed in state court falsely alleging and intending to mislead the court that Plaintiff and his mother had already removed the carpeting from their unit and replaced it with hardwood floors in violation of the association's policy - an allegation Defendants knew was a lie.

98. Defendant's intent was to use this fraud to mislead the court into allowing an inspection that was moot and irrelevant to begin with, serving as nothing more than intentional harassment, intimidation and retaliation because Plaintiff had a legal right to any flooring that best accommodated his disability.

99. The act of filing the lawsuit and multiple acts of continued litigation were and continue to be ongoing retaliation against Plaintiff seeking to harass him for exercising his Fair Housing rights. It was part of a larger conspiracy orchestrated by Defendants in an attempt to force Plaintiff out of the neighborhood, *because Plaintiff continues to pursue his Fair Housing rights*. Defendants through fraud mislead and use the courts as a weapon to harass and retaliate.

100. By early 2011 Plaintiff's health drastically declined and Plaintiff is declared permanently disabled by the Social Security Administration.

101. In early to mid 2011, Plaintiff files his pro se appearance in the state court lawsuit.

102. In mid to late 2011, Plaintiff's disability further deteriorates to a severe state of exacerbation that reduced Plaintiff's body weight to a critical 94 pounds further paralyzing his ability to engage in major life activities and even care for himself. Plaintiff became bedridden and required the 24-hour assistance of a caretaker.

103. Being pro se and due to his disability, Plaintiff required a reasonable accommodation from the court. Plaintiff submits a reasonable accommodation request pursuant to the Americans with Disabilities Act and presents it to the court along with affidavit requesting simply an extension of time to allow him to participate in the court proceeding and present his case.

104. The state court rules and procedures prevented plaintiff from having the opportunity to raise his claims and violated the Americans with Disabilities act by not allowing him a reasonable accommodation in the form of an extension of time that he needed in order to allow him to participate in court, thereby blocking him access to the court and denying the right to be heard.

105. Plaintiff did not have a reasonable opportunity to defend himself in the state court lawsuit solely because of his worsening disability. Plaintiff was subsequently unable to participate in the legal proceedings and for the remainder of the time in which substantive issues were litigated, due to the state court's failure to address and accommodate his disability.

106. Plaintiff was essentially punished for being disabled.

107. Additionally, the judge did not allow Plaintiff oral argument on his 2-619 Motion to

Dismiss despite the fact that it was a statutory right under 735 ILCS 110 the Illinois
Citizen Participation Act to one, and thus, in this example as well, Plaintiff was deprived
of an opportunity to fully participate in the legal proceedings:

> (735 ILCS 110/20)
>
> Sec. 20. Motion procedure and standards.
> On the filing of any motion as described in Section 15, *a hearing and decision
> on the motion must occur* within 90 days after notice of the motion is given to
> the respondent. An appellate court shall expedite any appeal or other writ,
> whether interlocutory or not, from a trial court order denying that motion or
> from a trial court's failure to rule on that motion within 90 days after that trial
> court order or failure to rule.
>
> Discovery shall be suspended pending a decision on the motion. However,
> discovery may be taken, upon leave of court for good cause shown, on the issue
> of whether the movants acts are not immunized from, or are not in furtherance
> of acts immunized from, liability by this Act.
>
> The court shall grant the motion and dismiss the judicial claim unless the court
> finds that the responding party has produced clear and convincing evidence that
> the acts of the moving party are not immunized from, or are not in furtherance
> of acts immunized from, liability by this Act.
>
> (Source: P.A. 95-506, eff. 8-28-07.)

108. Not only did the state court not address these issues and also deprive Plaintiff of a
reasonable opportunity, but it additionally deprived Plaintiff of the rights afforded to him
under the Americans with Disabilities Act and the Illinois Citizen Participation Act.

109. In 2012, during the height of Plaintiff's disability, Defendants through fraud and by
misleading the court obtained a default judgment against Plaintiff because Plaintiff was
incapacitated due to his disability and because Plaintiff's access to the court was blocked.

110. The sole reason Plaintiff was placed in default was due to his disability. A disability that
was not accommodated as a result of the state court rules and procedures.

111. The default entered against Plaintiff awarded Defendants $40,000 for attorney's fees,

and an order allowing them to inspect Plaintiff's unit within 14 days.

112. It is important to highlight the fact that the default judgement never mentions the word carpeting. Nor does it at anytime state that Plaintiff must maintain wall-to-wall carpeting inside his unit.

113. Neither the default, or any state court ruling, ever prevented Plaintiff from making FHA accommodation requests for substitution of carpeting.

114. Neither the default, or any state court ruling, ever prevented Defendants from granting Plaintiff's  accommodation requests to remove carpeting.

115. Defendants could have simply, at any time till present day, amended section 19 of their bylaws to include a provision that wall-to-wall carpeting is required unless someone has a disability or medical need to have it removed.

116. Defendants' discriminatory acts were and continue to be a cause of Plaintiff's injuries, not the default. The state court never made any rulings and nothing prevented Defendants from amending the bylaws to be in compliance with the FHA.

117. The default did not give Defendants a right to discriminate, nor did it block Plaintiff from vindicating his rights:

> "But if he claims, as he does, that people involved in the decision violated some independent right of his, such as the right (if it is a right) to be judged by a tribunal that is uncontaminated by politics, then he can, without being blocked by                          the Rooker-Feldman doctrine, sue to vindicate that right and show as part of his                          claim for damages that the violation caused the decision to be adverse to him and                          thus did him harm.   Nelson v. Murphy, 44 F.3d 497, 503 (7th Cir.1995);  GASH                          Associates v. Village of Rosemont, supra, 995 F.2d at 728.   **Otherwise there                          would be no federal remedy for a violation of**

**federal rights whenever the**
**judicial process as to obtain**
**such as Dennis v. Sparks**, 449 U.S.
and Casa Marie, Inc. v. Superior Court,

**violator so far succeeded in corrupting the state**
**a favorable judgment, as alleged in cases**
24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980),
988 F.2d 252, 259 (1st Cir.1993)."

From - Nesses v. Shepard, 68 F.3d 1003, 1005 (7th Cir. 1995)

118. The default simply states the obvious: for Plaintiff to be in compliance with the Defendants' bylaws, however the state court never prevented Defendants from granting reasonable accommodation and modification requests pursuant to and in accordance with state and federal anti-discrimination laws. Furthermore, the state court could not do so, because it would lack jurisdiction to make such a ruling.

119. The state court did not make any rulings as to the constitutionality and validity of the Defendants' practices and policies in their current form nor did the court issue any rulings as to their compliance or lack thereof pertaining to the FHA.

120. Defendants could have modified section 19 of their bylaws at any point in time to accommodate Plaintiff's disability, yet instead they chose not to. The state court never addressed the issues of FHA violations or reasonable accommodations.

121. In 2013, Plaintiff was hospitalized and treated for psychological injuries that resulted from continuous chronic stress, worsening of Plaintiff's physical disabilities and trauma brought on by the repeated denials for reasonable accommodations, incessant retaliation, harassment and unremitting mistreatment by Defendants.

122. The discrimination encompassing Fair Housing Act violations created a systemic pattern and practice of abuse that Plaintiff was forced to endure at the hands of Defendants.

123. Defendants' continuous abuse and mockery of Plaintiff's disability caused Plaintiff significant trauma which lead to the psychological breakdown of Plaintiff and general decline of his health.

124. Additionally, Plaintiff developed a stress-based cardiovascular condition that was caused solely by Defendants actions and their ongoing failure and refusal to accommodate.

125. Despite all this, Plaintiff made further requests for accommodation to Defendants continuously throughout these events, and presented new information regarding his deteriorating health condition to the board. Plaintiff presented additional health conditions further augmenting the need both for the cessation of harmful pesticide spraying and the removal of the carpeting.

126. Plaintiff's requests were all denied or ignored again.

127. In 2014, Plaintiff was tested by his treating physicians and diagnosed as being highly allergic to carpeting, dust mites and house dust. Plaintiff is given medications to treat the severe allergic reactions but they offer little help as the source of the allergens, the carpeting, remains present in Plaintiff's unit.

128. Plaintiff again wrote letters to Defendants informing them that carpeting and pesticides are causing harm to his health and reiterates his requests for reasonable accommodations with regards to carpeting and pesticides, in light of his new health conditions, which exacerbate his existing disabilities.

129. Plaintiff's doctors wrote more letters on behalf of Plaintiff in support of his requests for reasonable accommodations, stating that the removal of carpeting is a medical necessity.

130. Plaintiff was further diagnosed with additional allergic conditions and respiratory distress resulting from Defendants actions and was prescribed an ever-increasing number of medications.

131. Plaintiff's disease progressed to the point of permanency and his health no longer has any chance of recovery.

132. Plaintiff's health continues to deteriorate despite intensive treatment and medical care because the root cause of the problem, Defendants violations, remains unaddressed and ongoing.

133. The Defendants have not presently terminated their discriminatory practice of requiring carpeting in their units nor have they terminated their practice of requiring the Plaintiff to possess carpeting, despite knowledge of his disability and knowing of the physical and psychological harm this is causing onto Plaintiff. It is important to note that nothing prevents Defendants from granting Plaintiff's accommodation requests.

134. Neither have Defendants terminated their practice of knowingly applying hazardous chemicals and pesticides around and onto Plaintiff's unit, flagrantly disregarding Plaintiff's accommodation requests and breaching their duty of care to Plaintiff.

135. Since Plaintiff and his mother began making requests for accommodation, Defendants assessed fines to them numerous times for alleged violations that were both trivial and were not assessed on other unit owners throughout 2003 and continuing thru to present day.

136. Defendants filed a judgment lien procured through fraud against Plaintiff's residence and then, in early 2015, unlawfully garnished the bank account of Plaintiff's mother in an attempt to satisfy its judgment lien. Defendants took this action despite knowing Plaintiff's mother was not an owner of any unit within the Association's purview.

137. In July 2017, after the filing of this presently pending federal action, and in retaliation for it, Defendants again acted in retribution against Plaintiff for having exercised his protected Fair Housing rights by targeting his personal property including certain organic therapeutic plants being grown on Plaintiff's balcony. These items of personal property and therapeutic plants where being implemented in Plaintiff's treatment and in aid of his disability.

138. Defendants instructed maintenance contractors to remove said plants, placing them on the ground below Plaintiff 2nd story balcony, precisely in an area that is routinely, and had been recently, treated with pesticides to which Defendants knew Plaintiff cannot be exposed. Defendants not only left the plants on the ground below to die and be stolen, but went one step further instructing the contractors to make certain Plaintiff's property would not be returned.

139. Subsequently, after two months of abandonment, Defendants proceeded to inform Plaintiff that he himself must return these plants to his balcony within 10 days, otherwise they would be "disposed of". Defendants knew that because of his disability, Plaintiff would be unable to return these plants to his second story balcony by himself and again made a mockery of Plaintiff's disability.

140. Defendants refused to return Plaintiffs plants and personal property even after receiving numerous correspondence from Plaintiff's attorneys.

141. It is important to note that, at the same time, the balcony plants and patio items of every other resident were returned to them without any delay or stipulations whatsoever. Plaintiff was the only individual whose property was targeted. Plaintiff was the only resident whose property sustained irreparable damage and loss.

142. Defendants' attorney himself stated that the present form of the property that was removed from Plaintiff's balcony "appears as debris" in its current condition. The items were brought to this level of degradation after being discarded on the ground below for a period of nearly six months. This retaliation again inflicted a great amount of undue distress onto Plaintiff.

143. It was not until November/December 2017, when snow had already fallen, and Plaintiff's plants had been completely destroyed by this time, that Defendants finally brought the dead discarded remains, and broken pots onto Plaintiff's balcony, adding

insult to injury. This was one of the few coping methods Plaintiff had resorted to and now it too was destroyed at the hands of Defendants.

144. In January 2018, as a result of this latest act of Defendants' retaliation against Plaintiff for having filed this federal action, Plaintiff suffered a severe exacerbation of his health condition that required prolonged hospitalization and nearly cost Plaintiff his life.

## Count 1 – CONTINUOUS VIOLATIONS OF CIVIL RIGHTS PURSUANT TO THE FAIR HOUSING ACT OF 1968, 42 U.S.C., § 3601
**Disparate Impact: Policy and Practice of Applying Harmful Chemicals**

145. Plaintiff realleges and incorporates by reference paragraphs 1-144 as though they were fully restated herein.

146. Plaintiff neither requires nor requests this Court to review or overturn any state court rulings. Plaintiff seeks that only Defendants' ongoing conduct and actions be considered and ruled upon.

147. This count arises out of and was solely caused by Defendants' ongoing actions that are independent of any state court ruling. All damages were caused by and directly originate exclusively from Defendants' acts and are independent of any other factors not related to Defendants' conduct.

148. Plaintiff does not seek this Court to review the state court default, instead Plaintiff seeks this court to award damages for Defendants' ongoing acts of discrimination and failure to ensure that their policies and practices comply with the Fair Housing Act.

149. This is an action under Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, as amended ("FHA"), 42 U.S.C. §§ 3601-3631 to correct unlawful housing practices and policies that disparately impact groups of protected individuals on the basis of disability

and age, and to provide appropriate relief to Plaintiff who is adversely being affected by such continuous discriminatory practices.

150. Defendants via their Board of Directors and management company implement and enforce certain policies, practices, rules and regulations that are imposed upon and affect persons residing in the housing community under Defendants' management, governance and control.

151. Defendants maintain a policy and practice of frequently applying numerous toxic landscaping chemicals including pesticides, herbicides and fertilizers, onto the premises controlled and managed by Defendants.

152. Defendants' policies and continuous acts of applying these harmful chemicals are artificial, arbitrary, and unnecessary archaic barriers that disparately impact a protected class of disabled individuals, including Plaintiff, especially those with neurological disabilities, allergies, respiratory disabilities, autoimmune conditions and chemical sensitivities, that cannot tolerate, be exposed to and/or otherwise live in environments that contain these chemical substances.

153. These practices and policies cause unwarranted segregation and deprivation of rights as well as loss of housing opportunities for these groups of protected individuals.

154. It has been scientifically documented that these chemicals are among the most influential and determining factors present in the environment that affect the health of humans and exert harmful effects especially to persons with certain disabilities. As a result, people with certain disabilities, such as Plaintiff, are advised to avoid exposure to these chemicals within their living environment.

155. There is a great body of evidence, encompassing a wide array of scientific studies from major academic research institutions and numerous statements from national and international health protection agencies on the harmful effects of pesticides on human

health.

156. At all times in which Plaintiff was afflicted with his disabilities and resided in his condominium unit, Defendants had in place a policy and practice of spraying pesticides in a manner that injured Plaintiff and exacerbated his disabilities.

157. Additionally, Defendants' policies of applying toxic landscaping chemicals are artificial, arbitrary, and unnecessary barriers the disparately impact and discriminate against individuals on the basis of age.

158. Pesticides pose a great health risk to children and expecting mothers as these chemicals have acute and/or chronic toxic effects, especially on the developing immune, endocrine, neurological, gastrointestinal and respiratory systems of children.

159. Children are at highest risk for exposure due to their proximity to the ground where pesticides settle and their smaller body mass, underdeveloped immune and detoxification pathways along with higher breathing rates. All these characteristics of children act to increase their risk of exposure compared with adults. Outdoor pesticides are tracked into homes on shoes, strollers, and the bodies of children who run and play in pesticide treated areas.

160. Defendants know and have known that these practices and policies disparately impact protected groups of individuals, including Plaintiff, yet nonetheless Defendants steadfastly adhere to their discriminatory unlawful practices and policies.

161. Defendants know and have known that there are readily available non-discriminatory alternatives to their practices and policies that have no disparate impact and adequately serve the Defendants' needs, if any.

**Count 2 – CONTINUOUS VIOLATIONS OF CIVIL RIGHTS PURSUANT TO THE FAIR HOUSING ACT OF 1968, 42 U.S.C., § 3601**

**Disparate Impact: Policy of Wall-to-Wall Carpeting**

162. Plaintiff realleges and incorporates by reference paragraphs 1-161 as though they were fully restated herein.

163. Plaintiff neither requires nor requests this Court to review or overturn any state court rulings. Plaintiff seeks that only Defendants' ongoing conduct and actions, be considered and ruled upon.

164. This count arises out of and is solely caused by Defendants' ongoing actions that are independent of any state court ruling. All damages are caused by and directly originate exclusively from Defendants' acts and are independent of any other factors not related to Defendants' conduct.

165. Plaintiff does not seek this Court to review the state court default, instead Plaintiff seeks this court to award damages for Defendants' ongoing acts of discrimination and failure to ensure that their policies and practices comply with the Fair Housing Act.

166. This is an action under Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, as amended ("FHA"), 42 U.S.C. §§ 3601-3631 to correct unlawful housing practices and policies that disparately impact groups of protected individuals on the basis of disability and age, and to provide appropriate relief to Plaintiff who is adversely being affected by such continuous discriminatory practices.

167. Defendants via their Board of Directors and management company implement and enforce certain policies, practices, rules and regulations that are imposed upon and affect persons residing in the housing units under Defendants' management, governance and control.

168. Defendants maintain a policy and practice of mandating wall-to-wall carpeting inside the personal condominium units belonging to individual homeowners.

169. At all times during which the Plaintiff has been classified as a disabled person under the FHA, Defendants have enforced a policy requiring wall-to-wall carpeting in the condominium unit Plaintiff resided in. This policy, which has yet to be terminated as of the date of this filing, has a disparate impact on disabled people with the specific disabilities, including the Plaintiff, because it tends to make dwellings unavailable to people with his conditions.

170. Defendants' policies of mandating wall-to-wall carpeting are artificial, arbitrary, and unnecessary archaic barriers the disparately impact a protected class of disabled individuals, including Plaintiff, especially those with allergies, respiratory disabilities and immune system conditions, that cannot tolerate and/or be confined to living environments that contain carpeted floors.

171. It has been scientifically documented that carpets contain various pollutants and chemicals that are harmful to humans, especially persons with certain disabilities. This has been verified by numerous clinical and peer reviewed studies. As a result, people with certain disabilities, such as Plaintiff, are advised to not have carpeting within their indoor living environment.

172. Additionally, Defendants' policies of mandating wall-to-wall carpeting are artificial, arbitrary, and unnecessary barriers the disparately impact and discriminate against individuals on the basis of age.

173. Carpeting, especially of the wall-to-wall variety, can be harmful to children and expecting mothers, as such carpeting acts as a reservoir for contaminants including: pesticides, volatile organic compounds, petrochemicals, allergens, viruses, bacteria, molds, dust mites, among many other irritants that are especially damaging to children health and well-being.

174. Children have developing and sensitive immune systems that are negatively affected by

these common pollutants routinely found in carpeting. Children are more likely to be exposed to pollution in carpets as they spend time playing on the floor and due to their normal hand-to-mouth habits. Furthermore, carpet installation has been associated with wheezing and coughing in babies in their first year of life.

175. Defendants know and have known that these practices and policies disparately impact protected groups of individuals, yet nonetheless Defendants steadfastly adhere to their discriminatory unlawful practices and policies.

176. Defendants know and have known that there are available alternatives to their practices and policies that have no disparate impact and adequately serve Defendants'.

## Count 3 – CONTINUOUS VIOLATIONS OF CIVIL RIGHTS PURSUANT TO THE FAIR HOUSING ACT OF 1968, 42 U.S.C., § 3601

### Continuing Unlawful Denials of Pesticide Accommodations

177. Plaintiff realleges and incorporates by reference paragraphs 1-176 as though they were fully restated herein.

178. Plaintiff neither requires nor requests this Court to review or overturn any state court rulings. Plaintiff seeks that only Defendants' ongoing conduct, actions, their continued unlawful patterns and practices, be considered and ruled upon.

179. This count arises out of and was solely caused by Defendants' actions, their continued patterns and practices, that are independent of any state court ruling. All damages were caused by and directly originate exclusively from Defendants' continuous acts and are independent of any other factors not related to Defendants' ongoing conduct.

180. Plaintiff does not seek this Court to review the state court default, instead Plaintiff seeks this court to award damages for Defendants' ongoing acts of discrimination, intimidation,

retaliation and failure to ensure that their policies and practices comply with the Fair Housing Act.

181. This is an action under Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, as amended ("FHA"), 42 U.S.C. §§ 3601-3631 to correct unlawful housing practices on the basis of disability and to provide appropriate relief to Plaintiff who was adversely affected by such practices.

182. Plaintiff alleges that while living in the neighborhood under Defendants' control, he was subjected to egregious discrimination and harassment on account of his disability by Defendants, their agents and/or privies. Defendants were fully aware of and engaged in continuous and ongoing discrimination and harassment. The discrimination denied Plaintiff equal use and enjoyment of his property and created obstacles to the management of his health condition. Despite his requests for accommodation, Defendants failed to take appropriate corrective action to end the discrimination and harassment.

183. Under the Federal Fair Housing Act, as amended in 1988, it is illegal to: (a) make a dwelling unavailable to a person on account of a handicap, 42 U.S.C.A, § 3604(f); or (b) interfere with persons on account of having exercised their rights, or their having aided or encouraged other persons in the exercise or enjoyment or right, that are granted or protected by 42 U.S.C.A, § 3604(f), 42 U.S.C.A, § 3617.

184. Plaintiff suffers from numerous disabilities and is disabled or handicapped as defined by statute, state and federal law, that impair him from engaging in major life activities.

185. Plaintiff's disabilities require certain reasonable accommodations and/or modifications to allow him full enjoyment and usage of his residential unit.

186. Defendants are obligated by federal law to provide reasonable accommodations and/or modifications to Plaintiff.

187. Accommodation requests were made by Plaintiff on a frequent and recurrent basis since the early 2000s till present.

188. Defendants refused any and all of Plaintiff's requests for reasonable accommodations and in doing so violated the Fair Housing Act, and engaged in persistent patterns and practices of discrimination, perpetuating continuing unlawful acts and conduct.

189. Plaintiff requested countless times for the reasonable accommodation and/or modification of pesticide cessation pursuant to his Fair Housing rights. Said accommodation was required as a way to allow him full enjoyment of his unit and alleviate the burden of chemical exposure. Defendants discriminated against Plaintiff on the basis of his disability.

190. Plaintiff's autoimmune disability is negatively influenced and/or worsened by exposure to certain chemicals including the pesticides and herbicides Defendants are applying on the premises and areas surrounding Plaintiff's unit.

191. As a result of Defendants' denials of Plaintiff's reasonable accommodation and modification requests, Plaintiff suffered and was marginalized because of Defendants' continued pattern and practice of disability discrimination.

192. Because Defendants perpetually refuse to accommodate Plaintiff's disability, the practice of spraying said pesticides continues and Plaintiff is repeatedly forced to live as a prisoner inside his own home.

193. Plaintiff can no longer freely venture outside his unit and have the simple pleasure of enjoying a warm summer's day without being subjected to pesticide exposure. He is routinely prevented from opening his windows to let in a fresh breeze as the air routinely has the odor of hazardous chemicals.

194. Even walking from Plaintiff's unit to his automobile exposes him to pesticides due to the

frequency of repeated applications of pesticides by Defendants. This creates an unnecessary burden on Plaintiff and on certain days he is altogether prevented from leaving the building.

195. At all times relevant to this litigation, Defendants continue to refuse Plaintiff's request for accommodation regarding the spraying of pesticides and chemicals outside and near his unit. Defendants continue to regularly spray pesticides in areas proximate to Plaintiff's dwelling, and their conduct has not changed.

196. The 1988 amendments to the Federal Fair Housing Act, by its terms, render invalid any rule or policy that purports to require or permit any discriminatory housing practice. 42 U.S.C.A, § 3615.

197. Defendants' policy and practice regarding the use of herbicides, pesticides and landscape chemicals is discriminatory on its face because it serves to make dwellings unavailable and prevents disabled people the equal right to enjoy and use their units, facilities and premises, making these units and facilities inaccessible and/or unusable all on account of handicap in violation of the Federal Fair Housing Act, 42 U.S.C.A, § 3604(f) and 42 U.S.C.A, § 3617.

198. Defendants' continuous and ongoing refusal to abate the use of pesticides and accommodate Plaintiff's disability is arbitrary and discriminatory.

199. Defendants acted and continue to act intentionally, willfully, and in disregard for the rights of Plaintiff and other similarly situated persons.

200. Defendants' actions described above constitute a pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, or a denial of rights protected by the Fair Housing Act to a disabled person, which denial raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

201. Defendants' actions described above constitute: discrimination in the sale or rental, or otherwise making unavailable or denying, a dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(1); discrimination in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(2); a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person an equal opportunity to use and enjoy a dwelling, in violation of the FHA, 42 U.S.C. § 3604(f)(3)(B);e. interference with the rights of persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged persons with disabilities in the exercise or enjoyment of rights granted or protected by the FHA, in violation of 42 U.S.C. § 3617.

202. Plaintiff is a victim of Defendants' discriminatory conduct and is an "aggrieved person" within the meaning of 42 U.S.C. §§ 3602(i) and 3614(d)(1)(B), and has suffered harm, repeated injuries and damages as a result of Defendants' conduct.

203. The acts, practices and policies complained above continue to deprive Plaintiff of equal opportunities and fair treatment and otherwise adversely affect his health condition and status as a homeowner because of his disability. The unlawful housing practices and policies complained above are intentional, are executed with malice or with reckless indifference to the federally protected rights of Plaintiff.

204. Therefore Plaintiff seeks damages, including punitive damages, against Defendants for their discriminatory actions that have, and continue to violate his Fair Housing rights.

## Count 4 – CONTINUOUS VIOLATIONS OF CIVIL RIGHTS PURSUANT TO THE FAIR HOUSING ACT OF 1968, 42 U.S.C., § 3601

### Continuing Unlawful Denials of Carpeting Accommodations

205. Plaintiff realleges and incorporates by reference paragraphs 1-204 as though they were fully restated herein.

206. Plaintiff neither requires nor requests this Court to review or overturn any state court rulings. Plaintiff seeks that only Defendants' ongoing conduct and actions, constituting a continuous whole, be considered and ruled upon.

207. This count arises out of and was solely caused by Defendants' ongoing actions that are independent of any state court ruling. All damages were caused by and directly originate exclusively from Defendants' acts and are independent of any other factors not related to Defendants' conduct.

208. Plaintiff does not seek this Court to review the state court default, instead Plaintiff seeks this court to award damages for Defendants' ongoing acts of discrimination, intimidation, retaliation and failure to ensure that their policies and practices comply with the Fair Housing Act.

209. This is an action under Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, as amended ("FHA"), 42 U.S.C. §§ 3601-3631 to correct unlawful housing practices on the basis of disability and to provide appropriate relief to Plaintiff who is adversely being affected by such continuous practices.

210. Plaintiff alleges that while living in the neighborhood under Defendants' control, he is subjected to egregious discrimination and harassment on account of his disability by Defendants, their agents and/or privies. Defendants are fully aware of and constantly engage in the discrimination and harassment. The discrimination denies Plaintiff equal use and enjoyment of his property and creates obstacles to the management of his health condition. Despite his requests for accommodations, Defendants fail to take appropriate corrective action to end the discrimination and harassment.

211. Under the Federal Fair Housing Act, as amended in 1988, it is illegal to: (a) make a

dwelling unavailable to a person on account of a handicap, 42 U.S.C.A, § 3604(f); or (b) interfere with persons on account of having exercised their rights, or their having aided or encouraged other persons in the exercise or enjoyment or right, that are granted or protected by 42 U.S.C.A, § 3604(f), 42 U.S.C.A, § 3617.

212. Plaintiff suffers from numerous disabilities and is disabled or handicapped as defined by statute, state and federal law.

213. Plaintiff's disabilities require certain reasonable accommodations and/or modifications to allow him full enjoyment and usage of his residential unit.

214. Defendants are obligated by federal law to provide reasonable accommodations and/or modifications to Plaintiff.

215. Plaintiff asked for accommodations, including requests to remove the carpeting inside his residence, accompanied by letters attesting to the medical necessity of this accommodation from his healthcare providers.

216. Such accommodation requests were made by Plaintiff on a frequent and recurrent basis since 2009 till present.

217. Defendants refuse any and all of Plaintiff's requests for reasonable accommodations and in doing so violate the Fair Housing Act.

218. Defendants' denials of Plaintiff's requests for accommodation are without legal basis or merit.

219. The replacement of Plaintiff's carpeting with an alternative, hypoallergenic flooring, is an accommodation that is reasonable and medically necessary for Plaintiff to have equal use and enjoyment of his dwelling.

220. In 2009, Plaintiff began requesting that he be allowed to remove the carpeting present in his unit as an accommodation for his autoimmune disability.

221. Due to the fact that carpeting accumulates and harbors all manner and form of environmental pollutants, allergens and toxins, including pesticides and chemicals carried into the home via personal clothing and footwear, the presence of carpeting creates a health challenge and risk to Plaintiff's autoimmune disability.

222. Because Defendants denied all of Plaintiff's previous accommodation requests pertaining to pesticides, Plaintiff now made the carpeting removal request as a way to minimize exposure and mitigate damages from Defendants' rampant use of pesticides surrounding Plaintiff's property and for accommodation of his autoimmune disability.

223. The first instance of when the Defendants refused to allow Plaintiff to remove his carpeting was in 2009 prior to the initiation of the lawsuit against him. Plaintiff has made continuous requests to remove his carpeting since then and to present day - which Defendants have deny or ignore, even though nothing prevents Defendants from granting Plaintiff's requests.

224. Plaintiff pursued his Fair Housing rights and wrote letters to Defendants seeking approval for removal of carpeting as a way to accommodate his autoimmune disability. There was no legitimate reason not to allow Plaintiff's reasonable accommodation requests seeing as all costs related to the removal and replacement of said carpeting would be absorbed by Plaintiff and would not create any financial obligations for Defendants in any way, and all modification would be limited to the inside of Plaintiff's unit.

225. After the state court entered a default judgment against Plaintiff he was subsequently diagnosed with other medical conditions, including a respiratory disability, which provided additional newly discovered reasons to have the carpeting removed.

226. The default did not, in any way, affect Plaintiff's Fair Housing rights.

227. It is important to highlight the fact that the default judgement entered in 2012 never mentions the word carpeting. Nor does it at anytime state that Plaintiff must maintain wall-to-wall carpeting inside his unit.

228. Neither the default, nor any other factors, ever prevented Plaintiff from making continued FHA accommodation and/or modification requests for substitution of carpeting.

229. Neither the default, nor any other factors, ever prevented Defendants from granting Plaintiff's accommodation and/or modification requests to remove carpeting, including for new disabilities that were diagnosed after the judgment was entered.

230. Nothing in the default or any state court rulings, whatsoever, at any point in time, prevented Defendants from amending their bylaws, declaration and/or rules to be in compliance with the FHA and it would have been a very simple undertaking for Defendants to simply change section 19 of their bylaws to include a provision that wall-to-wall carpeting is required unless someone has a disability or medical need to have it removed.

231. The 1988 amendments to the Federal Fair Housing Act, by its terms, render invalid any rule or policy that purports to require or permit any discriminatory housing practice. 42 U.S.C.A, § 3615.

232. Defendants' discriminatory acts were and continue to be a cause of Plaintiff's injuries. The default did not, in any way, allow Defendants a right to discriminate.

233. Long after entry of the default, Plaintiff was diagnosed with a respiratory disability that bolstered his need to have the carpeting in his unit removed. Plaintiff continues making requests pursuant to his Fair Housing rights not only as an accommodation for his

autoimmune disability, but now as an accommodation for new respiratory disabilities that had become apparent and were not known prior. To this day the full extent of Plaintiff's injuries are still constantly manifesting as new diagnoses are being discovered.

234. Plaintiff subsequently made additional accommodation requests to have the carpeting removed, and presented new medical conditions to the Defendants, which did not exist before the state court judgment was entered. However, the Defendants still failed to allow Plaintiff to remove the carpeting, in violation of the Fair Housing Act.

235. At all times relevant to this litigation, Defendants refuse and continue to refuse Plaintiff's requests for accommodation and/or modification.

236. Defendants' acts of refusing to change and maintaining a policy regarding floor coverings within individual units, even though nothing prevents them from modifying said policy, is discriminatory on its face because it serves to make dwellings unavailable to persons on account of their handicap in violation of the Federal Fair Housing Act, 42 U.S.C.A, § 3604(f) and 42 U.S.C.A, § 3617.

237. Additionally, Plaintiff lacked a reasonable opportunity to adequately represent his interests regarding carpeting in the state court lawsuit.

238. When Plaintiff was notified of the state court lawsuit filed against him, he was was briefly represented by an attorney who made one 2-619 Motion to Dismiss on Plaintiff's behalf: an Anti-SLAPP motion pursuant to the Citizen Participation Act. The Citizen Participation Act specifies that a hearing must take place if any motion is made pursuant to the Act. 735 Ill. Comp. Stat. Ann. 110/20:

> Sec. 20. Motion procedure and standards.
>
> On the filing of any motion as described in Section 15, *a hearing and decision on the motion must occur* within 90 days after notice of the motion is given to the respondent.

239. Despite the statutory requirement that a hearing must take place for the motion, the judge denied the hearing. Therefore, Plaintiff was deprived of an opportunity to present any arguments in order to dismiss the lawsuit.

240. Further, after the judge denied the motion and Plaintiff's attorney withdrew, Plaintiff, being a pro se litigant, made ADA accommodation requests to the state court for an extension of time in order to allow him the opportunity to participate in the state court lawsuit. The ADA accommodation requests were made due to Plaintiff's failing health and disability.

241. The judge denied his ADA accommodation requests, and Plaintiff was subsequently unable to meaningfully participate in the lawsuit for the remainder of the time in which substantive issues were litigated, including the time limit for an appeal.

242. Plaintiff was therefore deprived of all reasonable opportunity to present or raise any issues in state court, and in fact Plaintiff was penalized on account of his disability.

243. Defendants' continuous and ongoing refusals to modify their policy to permit Plaintiff the right to remove the carpeting in his unit is arbitrary and discriminatory because it serves to make dwellings unavailable to persons on account of their handicap in violation of the Federal Fair Housing Act, 42 U.S.C.A, § 3604(f) and 42 U.S.C.A, § 3617.

244. Defendants acted and continue to act intentionally, willfully, and in disregard for the rights of Plaintiff and other similarly situated persons.

245. Defendants' actions described above constitute a pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, or a denial of rights protected by the Fair Housing Act to a disabled person, which denial raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

246. Defendants' actions described above constitute: discrimination in the sale or rental, or otherwise making unavailable or denying, a dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(1); discrimination in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(2); a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person an equal opportunity to use and enjoy a dwelling, in violation of the FHA, 42 U.S.C. § 3604(f)(3)(B);e. interference with the rights of persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged persons with disabilities in the exercise or enjoyment of rights granted or protected by the FHA, in violation of 42 U.S.C. § 3617.

247. Plaintiff is a victim of Defendants' discriminatory conduct and is an "aggrieved person" within the meaning of 42 U.S.C. §§ 3602(i) and 3614(d)(1)(B), and suffers harm and damages solely as a result of Defendants' continuous unlawful conduct.

248. The the acts, practices and policies complained above deprive Plaintiff of equal opportunities and fair treatment and otherwise adversely affect his health condition and status as a homeowner because of his disability. The unlawful housing practices and policies complained above are intentional, are done with malice or with reckless indifference to the federally protected rights of Plaintiff.

249. Therefore Plaintiff seeks damages, including punitive damages, against Defendants for their continuous discriminatory actions that violate his Fair Housing rights.

## Count 5 – CONTINUOUS RETALIATION UNDER THE FAIR HOUSING ACT OF 1968, 42 U.S.C., SECTION 3601

250. Plaintiff realleges and incorporates by reference paragraphs 1-249 as though they were

fully restated herein.

251. Plaintiff neither requires nor requests this Court to review or overturn any state court rulings. Plaintiff seeks that only Defendants' conduct and actions be considered and ruled upon.

252. This count arises out of and is solely caused by Defendants' actions that are independent of any state court ruling. All damages are caused by and directly originate exclusively from Defendants' continuous unlawful acts and are independent of any other factors not related to Defendants' conduct.

253. Plaintiff does not seek this Court to review the state court default, instead Plaintiff seeks this Court to award damages for Defendants' ongoing acts of intimidation, retaliation and failure to ensure that their policies and practices comply with the Fair Housing Act.

254. Plaintiff belongs to a protected class of disabled individuals as defined by statute, state and federal law.

255. Plaintiff's disabilities require certain reasonable accommodations and/or modifications to allow him full enjoyment and usage of his residential unit.

256. Defendants are obligated by federal law to provide reasonable accommodations and/or modifications to Plaintiff.

257. Such accommodation requests are made by Plaintiff on a frequent and recurrent basis since the early 2000s till present.

258. Defendants refuse any and all of Plaintiff's requests for reasonable accommodations and in doing so violate the Fair Housing Act.

259. Plaintiff is engaged in the exercise and/or enjoyment of his Fair Housing rights. The

pursuit of these rights includes, among others, numerous requests for reasonable accommodations and/or modifications in order to allow him full enjoyment of his unit and alleviate the burden of his disabilities.

260. Defendants not only discriminate against Plaintiff on the basis of his disability, but in fact, engage in retaliation, interference, coercion and intimidation against Plaintiff on account of his protected FHA activities.

261. Defendants are motivated by an intent to discriminate and punish Plaintiff.

262. Defendants retaliated and continue to retaliate thereby inflicting continuing and repeated injuries onto Plaintiff.

263. At all times relevant to this lawsuit, Defendants' continuing unlawful acts and conduct have never stopped and persistently inflict repeated injuries onto Plaintiff till present day.

264. After Plaintiff and his mother made requests for the Defendants to stop the spraying of pesticides that negatively affected his health and disability the Defendants began a campaign of continuous and retaliatory harassment beginning in the early 2000s and persisting until present day.

265. This campaign of retaliatory harassment consists of countless unlawful acts that were part of a concentrated effort and continuous whole to alienate and force Plaintiff out of his home in retaliation for the persistent reasonable accommodation requests.

266. Defendants' acts are a manifestation of their policy and practice that discriminates on the basis of disability and form a pattern and practice of systemic discrimination. The acts which constitute the retaliatory conduct complained of in this Count were continually conducted until present day.

267. Plaintiff cannot pinpoint one specific act or instance of retaliation which began the series

of continuing acts that constitute this Count. The specific conduct Defendants engaged in did not alert Plaintiff that the conduct was retaliatory at the time the violations occurred. Plaintiff gradually learned of the Defendants' intent after it evolved into a continuous whole.

268. Plaintiff was engaged in activity protected by and in furtherance of the Fair Housing Act, and/or aided and encouraged others to exercise and enjoy their FHA protected rights with regards to pesticides and other toxic chemicals that were and continue to be applied in Plaintiff's residential area as well as Defendants' carpeting policies both of which make units unusable and/or unlivable for persons with certain disabilities.

269. Defendants coerced, intimidated, threatened and interfered with the statutorily protected activities and accommodation requests of Plaintiff and in doing so Defendants were motivated by an intent to discriminate and punish because Plaintiff exercised his Fair Housing rights.

270. Defendants would consistently retaliate against Plaintiff and threaten him with claims of alleged fictitious violations that Defendant's, their agents and/or privies concocted themselves and/or knew were untrue.

271. Defendants relentlessly pursued these fabricated lies and used them as ammunition against Plaintiff with the intent of causing harm and distress.

272. Defendants abuse their position of power by utilizing it to retaliate against Plaintiff and subjecting him to meritless fines for non-existent violations precisely because and specifically in response to Plaintiff's reasonable accommodation and modification requests.

273. Defendants intend that their retaliation against Plaintiff will force Plaintiff to surrender his Fair Housing rights. Each time they realized Plaintiff was standing firm by his rights, Defendants would routinely continue to invent new ways to harass and conspire against

Plaintiff.

274. The retaliation evolved into a multilevel plan to continually defraud and cause harm to Plaintiff all because he needed simple accommodations of his disability, pursued them, and refused to surrender his rights.

275. Defendants' retaliation was not limited to one or a few independent acts, the retaliation was and continues to be a multifaceted scheme of retaliation where various methods and modalities of intimidation, coercion and interference act in concert with one another to enhance the effectiveness and accomplish what one or a few acts alone could not do. Defendants' retaliation plot remains in effect and constantly active, Defendants have never ceased their retaliation activities against Plaintiff.

276. Defendants have and continue to retaliate by knowingly making the decision to spray pesticides not only in the area surrounding Plaintiff's unit, but precisely onto Plaintiff's balcony, his organic medicinal plants, his air conditioning unit, onto and/or through his windows, among many others.

277. Defendants were informed and knew that due to financial reasons and the current state of the housing market (during the 2008-2012 economic collapse) Plaintiff was unable to relocate and Defendants knew he would be entrapped and forced to live devoid of the accommodations crucial to the state of his health. Defendants took advantage of this to bolster their retaliation.

278. Defendants' retaliation was in response to Plaintiff's exercise of protected Fair Housing rights. Defendants sent Plaintiff threatening and retaliatory letters including a 10 day notice of eviction and demand for possession of property, which were unrelated to the enforcing of the state court judgement. These letters stated that Defendants' elected to terminate Plaintiff's lease and that he had 10 days to surrender possession of his unit - actions Defendants knew they could not legally do.

279. Defendants made a decision to force Plaintiff and his mother out of the neighborhood. Defendants specifically told Plaintiff and his mother of this decision and articulated to Plaintiff and his mother that they were no longer wanted in the community.

280. The object of the served notice to quit possession was Plaintiff because that is precisely what Defendants had said.

281. Defendants had orchestrated a plot to evict Plaintiff out of the neighborhood and intended to accomplish this via a multifactorial approach that would include, but not solely rely on, the pursuit and continuance of prolonged retaliatory and fraudulent lawsuits, with the end goal being that "a few thousand dollars will push them [Plaintiff and his mother] over the edge".

282. In 2010, following Plaintiff's repeated and frequent requests for accommodation to stop the spraying of pesticides and to remove his carpeting, Defendants initiated retaliatory litigation that continues till the present day against Plaintiff seeking an injunction to inspect his unit, faking concern over his flooring, in order to harass Plaintiff, burden him with legal expenses, with the ultimate purpose of forcing him to move out.

283. Defendants had never before initiated and continually maintained such prolonged and costly litigation against any unit owner for such an extended amount of time.

284. The retaliatory lawsuit was just one form of retaliation among a continuous series of unlawful retaliatory methods and acts continuing until present day - just a drop in an endless sea of Defendants' retaliation.

285. Defendants intended to abuse the legal system and use the courts as an extension of their barrage of retaliation against Plaintiff - employing these tactics as complementary to Defendants' other methods of retaliation. Defendants' frivolous lawsuits were and continue to be an arm of a larger fraudulent plot and conspiracy. Defendants continued pursuit of litigation is intended and has been used as intimidation and retaliation against

Plaintiff, irrespective of the outcome of any court order or ruling.

286. Initiation of retaliatory litigation, was not a single overt act, it was part of a pattern and practice of incessant retaliation, it was part of Defendants' policy that remains in effect - to discriminate on the basis of disability. In itself, retaliation may take many forms, this was but one of its forms, Defendants exploited countless other methods of retaliating against and harassing Plaintiff. The act of suing and the acts of continuing to pursue litigation against Plaintiff for having acted in furtherance of his Fair Housing rights, was just an example of one of the forms Defendants employed. It was simply a limb of a larger organism, part of a larger continuing practice of unlawful acts and conduct used to discriminate and retaliate against Plaintiff.

287. Defendants engaged in the above retaliatory conduct specifically because Plaintiff had made, and continued to make, reasonable accommodation requests under the Fair Housing Act to stop the spraying of pesticides and to remove carpeting.

288. It is evident that Defendants' retaliation never subsided and in fact has intensified with the passage of time.

289. After Plaintiff started making his requests for accommodation, Defendants began assessing fines to Plaintiff numerous times for alleged violations that were both trivial and were not assessed on other unit owners and continuing to present day. Additional retaliatory conduct included, but was not limited to: new discriminatory fines, verbal harassment and vandalizing of personal property.

290. It is by and through Defendants' actions alone that Plaintiff has suffered damages.

291. Plaintiff requested MSDS (material safety data sheets) for the pesticides and herbicides, however instead if being provided these documents, he was unlawfully denied the right to them by Defendants and was specifically informed that Defendants intend to block Plaintiff's right to this information.

292. Defendants stated to Plaintiff that they were going to "contact their attorney" if Plaintiff did not immediately cease his accommodation requests. Defendants threatened Plaintiff with legal action for having exercised his Fair Housing rights.

293. Defendants notified Plaintiff that all of Plaintiff's communications and requests to Defendants would be ignored and "placed in the spam folder".

294. Defendants retaliated against Plaintiff for filing this Federal action.

295. In July 2017, after the filing of this presently pending Federal action, and in retaliation for it, Defendants again acted in retribution against Plaintiff for having exercised his protected Fair Housing rights by targeting his personal property including certain organic therapeutic plants being grown on Plaintiff's balcony. These items of personal property and therapeutic plants where being implemented in Plaintiff's treatment and in aid of his disability.

296. Defendants instructed maintenance contractors to remove said plants, placing them on the ground below Plaintiff 2nd story balcony, precisely in an area that is routinely, and had been recently, treated with pesticides to which Defendants knew Plaintiff cannot be exposed. Defendants not only left the plants on the ground below to die and be stolen, but went on step further instructing the contractors to make certain Plaintiff's property would not be returned.

297. Subsequently, after two months of abandonment, Defendants proceeded to inform Plaintiff that he himself must return these plants to his balcony within 10 days, otherwise they would be "disposed of". Just as they previously did with their 10 day notice of eviction and demand for possession, giving Plaintiff 10 days to vacate his home (under the false pretense and lie of the termination of a non-existent lease), this time Defendants gave Plaintiff 10 days to remove the property that was unlawfully taken away from him.

298. Defendants knew that because of his disability, Plaintiff would be unable to return these plants to his second story balcony by himself and again made a mockery of Plaintiff's disability.

299. Defendants refused to return Plaintiff's plants and personal property even after receiving numerous correspondence from Plaintiff's attorneys.

300. It is important to note that, at the same time, the balcony plants and patio items of every other resident were returned to them without any delay or stipulations whatsoever. Plaintiff was the only individual whose property was targeted. Plaintiff was the only resident whose property sustained irreparable damage and loss.

301. Defendants' attorney himself stated that the present form of the property that was removed from Plaintiff's balcony "appears as debris" [in its current condition]. The items were brought to this level of degradation after being discarded on the ground below by Defendants for a period of nearly six months. This retaliation again inflicted a great amount of undue distress onto Plaintiff, and sent a clear message that if Plaintiff continues to pursue his rights, Defendants will simply continue to retaliate.

302. It was not until November/December 2017, when snow had already fallen, and Plaintiff's plants had been destroyed by this time, that Defendants finally brought the dead discarded remains, and broken pots onto Plaintiff's balcony, adding insult to injury. This was one of the few coping methods Plaintiff had resorted to and now it too was destroyed at the hands of Defendants.

303. Defendants deliberately, and in retaliation, continue to make certain that the area around Plaintiff's unit will be sprayed with pesticides and other toxic chemicals. Even after the filing of this Federal complaint Defendants continue to deliberately spray around Plaintiff's unit, balcony and plants.

304. Defendants continue to retaliate and make a mockery of Plaintiff's disability by

spreading rumors and deliberate lies throughout the condominium association claiming he is not disabled, turning neighbors who have never even met or knew of Plaintiff against Plaintiff. Defendants initiated conspiring with neighbors to implement a plan to force Plaintiff out of his community.

305. Defendants undertook the above actions, and countless other adverse actions continuing until present day, against Plaintiff only after and precisely because Plaintiff made multiple requests for accommodation under the Fair Housing Act as to give rise to a reasonable inference of retaliation for Plaintiff's lawful exercise of his rights.

306. As of the date of this filing, Defendants acted and continue to act intentionally, willfully, and in disregard for the rights of Plaintiff and other similarly situated persons.

307. Defendants' actions described above constitute a pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, or a denial of rights protected by the Fair Housing Act to a disabled person, which denial raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

308. Defendant's actions described above constitute: discrimination in the sale or rental, or otherwise making unavailable or denying, a dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(1);discrimination in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(2); a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person an equal opportunity to use and enjoy a dwelling, in violation of the FHA, 42 U.S.C. § 3604(f)(3)(B);e. interference with the rights of persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged persons with disabilities in the exercise or enjoyment of rights granted or protected by the FHA, in violation of 42 U.S.C. § 3617.

309. Plaintiff is a victim of Defendant's discriminatory conduct and is an "aggrieved person" within the meaning of 42 U.S.C. §§ 3602(i) and 3614(d)(1)(B), and suffers harm and damages as a result of Defendant's continuous unlawful conduct.

310. Defendants attempted to coerce Plaintiff into believing that his legitimate requests for accommodation were mertiless and that he had no right to them.

311. Defendants targeted Plaintiff via threats of fining, threats of litigation, threats of eviction, threats of calling the police, threats of financial ruin, among others. Defendants acted to retaliate, coerce and intimidate Plaintiff into surrendering his Fair Housing rights as well as punishing him for having pursued them.

312. Defendants made conscious decisions to discriminate and intimidate Plaintiff. Defendants consciously decided to perpetuate patterns, practices and policies of retaliation. Defendants' conduct of retaliation was extreme, outrageous and abusive as to warrant an award of punitive damages under the Fair Housing Act.

## COUNT 6 - NEGLIGENCE
### Negligently Failing to Maintain Safety of Premises

313. Plaintiff realleges and incorporates by reference paragraphs 1-312 as though they were fully restated herein.

314. Plaintiff neither requires nor requests this Court to review or overturn any state court rulings. Plaintiff seeks that only Defendants' continuous unlawful conduct and actions be considered and ruled upon.

315. This count arises out of and was solely caused by Defendants' actions that are independent of any state court ruling. All damages were caused by and directly originate exclusively from Defendants' continuous acts and are independent of any other factors

not related to Defendant's conduct.

316. Plaintiff does not seek this Court to review the state court default, instead Plaintiff seeks this Court to award damages for Defendants' ongoing acts of intimidation, retaliation and failure to ensure that their policies and practices comply with applicable governing laws.

317. At all times relevant to this litigation, Defendants had a duty to exercise reasonable due care in the management of the premises for the safety of the residents in those areas under Defendants' control. Defendants' duty of care owed to residents, including Plaintiff, encompassed ensuring the safety of said premises, keeping them free from hazardous chemical substances such as known carcinogenic and immune system disrupting pesticides and herbicides, providing accurate, true, and correct information concerning the risks of applying these pesticides and appropriate, accurate and complete warnings concerning the potential adverse effects of exposure to said pesticides as well as providing advance notifications and warnings of the intended days of application and spraying schedule.

318. At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of the pesticides and specifically, their carcinogenic, mutagenic and immune system disrupting properties.

319. Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to said pesticides could cause, be associated with or worsen Plaintiff's injuries and thus create a dangerous and unreasonable risk of injury to the residents coming in contact with these pesticides, including Plaintiff.

320. Defendants also knew or, in the exercise of reasonable care, should have known that residents may have been unaware of the risks and the magnitude of the risks associated with use of and/or exposure to the pesticides and herbicides.

321. As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the selection, application, purchase and use of said pesticides within the premises managed and controlled by Defendants, in that Defendants negligently applied or caused to be applied said pesticides while knowing or having reason to know that the residents' and Plaintiff's exposure to these chemicals created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn or notify of these risks and injuries.

322. Nothing prevented Defendants from researching, investigating and reviewing the safety of the pesticides they were applying. Nothing blocked Defendants from providing adequate warnings to residents and implementing safe alternatives. In fact, Defendants wrongfully concealed and withheld information and have further made false and/or misleading statements concerning the safety and/or exposure to said pesticides.

323. Defendants' negligence included:

A.      Failing to review and examine sufficient studies to determine whether the pesticides and herbicides were safe for their intended use in landscaping;

B.      Failing to provide adequate instructions, guidelines and safety precautions to residents who Defendants could reasonably foresee would come in contact with and be exposed to these pesticides;

C.      Failing to notify Plaintiff and other residents of the intended pesticide application schedule, so that individuals could choose to minimize exposure by avoiding certain activities on days of application;

D.      Failing to disclose to Plaintiff and other residents that the use of and exposure to these pesticides presented severe health and safety risks of cancer, immune system dysregulation, respiratory complications, neurological deficits, gastrointestinal disorders, endocrinological disruption and other grave illnesses;

E.      Failing to warn Plaintiff and other residents that the risk of harm was

unreasonable and that there were safer and effective alternatives available;

F.   Systemically suppressing or downplaying contrary evidence about the risks, incidence and prevalence of the side effects of these pesticides and herbicides;

G.   Representing that the applications and pesticide products were safe for their intended use, when in fact, Defendants knew or should have known that the products were not safe for their intended purpose;

H.   Declining to propose or make any changes to the applications of pesticides that would inform residents of the risks associated with said pesticide applications.

I.   Endorsing, recommending and encouraging the use of pesticides, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to the pesticides;

J.   Continuing to disseminate information to Plaintiff and other residents, which indicate or imply that Defendants' applications of pesticides are not unsafe for use on the premises managed and controlled by Defendants;

K.   Continuing the application of pesticides and herbicides while possessing the knowledge that these chemicals were unreasonably unsafe and dangerous;

L.   Causing the chemicals and pesticides to be routinely applied under conditions that are deemed unsafe and dangerous, such as under windy conditions via a pressurized hose that would blast the pesticides 20-40 feet into the air;

M.   Spraying of the pesticides in the direction of open windows, causing the penetration of pesticides through Plaintiff's window into his unit and onto the carpeting;

N.   Knowingly applying pesticides near and directly onto resident units, balconies, patios, air conditioning units, walkways, driveways, near storm drains, drainage ditches, in vicinity of pedestrians, in the presence of

children, onto parked automobiles, among others.

O.        placing the subjective cosmetic appearance of the lawn as a higher priority than the safety, health and well-being of Plaintiff and other residents.

324. Defendants knew and/or should have known that it was foreseeable that residents such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the management and maintenance of the premises.

325. Defendants knew and/or should have known that it was foreseeable that residents such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the application of pesticides and herbicides.

326. Plaintiff did not know the true nature and extent of injuries that could result from the intended use of and/or exposure to these pesticides.

327. Defendants' negligence was the cause and proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

328. Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of residents, including Plaintiff, with full knowledge of the dangers of their pesticide usage. Defendants made conscious decisions not to refrain from excessive pesticide use, warn, notify or inform unsuspecting residents, including Plaintiff. Defendants reckless conduct therefore warrants an award of punitive damages.

329. As a direct and proximate result of Defendants' continuous wrongful acts and omissions in using and regularly applying pesticides and chemicals onto the premises and areas under Defendants' control, without adequate notification or warnings of the hazardous, mutagenic, carcinogenic and immune system disrupting nature of these pesticides, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses, significant expenses for medical care and treatment and will continue to incur these

expenses in the future.

## COUNT 7 - NEGLIGENCE
### Negligently creating unsafe living environment

330. Plaintiff realleges and incorporates by reference paragraphs 1-329 as though they were fully restated herein.

331. Plaintiff neither requires nor requests this Court to review or overturn any state court rulings. Plaintiff seeks that only Defendants' continuous unlawful conduct and actions be considered and ruled upon.

332. This count arises out of and was solely caused by Defendants' actions that are independent of any state court ruling. All damages are caused by and directly originate exclusively from Defendants' acts and are independent of any other factors not related to Defendants' conduct.

333. Plaintiff does not seek the this Court to review the state court default, instead Plaintiff seeks this Court to award damages for Defendants ongoing unlawful acts of negligently creating an unsafe living environment, and failure to ensure that their policies and practices comply with governing laws.

334. Defendants owed Plaintiff a duty of care to ensure that their bylaws, declaration or rules do not pose a health and safety hazard for residents, including people with disabilities, such as Plaintiff, and that Plaintiff would be allowed to keep his home in compliance with his health requirements.

335. Defendants owed Plaintiff a duty of care to ensure that he would be allowed to live in a safe and healthy environment free from dangerous conditions and health hazards.

336. Defendants breached their duty by failing to maintain policies and practices that

encourage and/or support the health and safety of residents. including Plaintiff, and failing to change their policies to allow residents the ability of removing carpeting.

337. Defendants knew and/or should have known that the presence of carpeting in units, especially those occupied by persons with special needs, could cause injury, deterioration as well as exacerbation of an individual's disability.

338. Defendants knew and/or should have known that it was foreseeable that residents such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the management and maintenance of the premises, including governance of rules pertaining to the insides of units.

339. Defendants knew and/or should have known that carpeting accumulates and outgasses hazardous particulates including but not limited to: volatile organic compounds "VOCs", pesticides, herbicides and allergens, among others.

340. Defendants' breach caused an unnatural accumulation of toxic substances, which caused Plaintiff to suffer serious and permanent physical injuries including medically documented damage to his immune, endocrine, respiratory and gastrointestinal systems.

341. Plaintiff's injuries were the foreseeable outcome of Defendants' failure to properly manage, accommodate and maintain the community.

342. Defendants were on notice of the health and safety concerns of their actions and/or inactions as Plaintiff had notified them numerous times.

343. The Defendants' negligence caused Plaintiff permanent physical, mental, emotional, and economic damages.

344. Defendants knew or should have known at the time of their denial of Plaintiff's accommodation requests that refusal to allow Plaintiff to remove carpeting from his unit

could result in severe illnesses and injuries or the worsening of existing illness and development of new injury.

345. Defendants acts of not accommodating Plaintiff's requests to remove carpeting caused a health and safety hazard and was willful, wanton, malicious, fraudulent and conducted with reckless disregard for the health and safety of Plaintiff and other similarly situated residents.

346. Therefore, as a result of the unreasonable denials of Plaintiff's requests, and their failure to maintain a safe living environment, Defendants are strictly liable to Plaintiff.

347. Defendants' reckless rejection and disregard for Plaintiff's health and safety were substantial and contributing factors in causing Plaintiff grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained their injuries.

348. Defendants' conduct, as described above, was reckless. Defendants risked the health and well-being of residents and homeowners, including Plaintiff, with knowledge of the safety problems associated with a policy that forces the installation and seeks to maintain wall-to-wall carpeting within the individual units of disabled residents and homeowners, including Plaintiff, who due to their disability and health condition cannot live in units with the presence of carpeting.

349. Defendants made a conscious decision not to discontinue from their policy and practice of forcing disabled residents to endure exposure to hazardous chemicals and allergens contained in and/or outgassed via carpeting. Defendants' reckless conduct warrants and award of punitive damages.

350. As a direct and proximate result of Defendants actions including a systemic pattern of disability discrimination, forcing disabled persons, such as Plaintiff herein, to live in an hazardous environment devoid of the needed accommodations necessary to alleviate the burden of their health conditions, failing to maintain and negligently mismanaging the

health and safety, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical treatment. Plaintiff will continue to incur these expenses in the future.


## Count 8 – CONTINUOUS NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

351. Plaintiff realleges and incorporates by reference paragraphs 1-350 as though they were fully restated herein.

352. Plaintiff neither requires nor requests this Court to review or overturn any state court rulings. Plaintiff seeks that only Defendants' continuous unlawful conduct and actions be considered and ruled upon.

353. This count arises out of and is solely caused by Defendants' actions that are independent of any state court ruling. All damages are caused by and directly originate exclusively from Defendants' acts and are independent of any other factors not related to Defendants' conduct.

354. Plaintiff does not seek this Court to review the state court default, instead Plaintiff seeks this Court to award damages for Defendants' ongoing acts of infliction of emotional distress and failure to ensure that their policies and practices comply with the Fair Housing Act.

355. Defendants owed Plaintiff a duty of care to ensure that the exterior of his home was maintained safely, free from dangerous conditions and free from hazardous substances.

356. Defendants breached their duty by failing to remove and prevent the usage of hazardous cancer causing, immune disrupting, and otherwise dangerous chemical substances including pesticides and herbicides.

357. Defendants' breach caused an unnatural accumulation of toxic substances, which caused Plaintiff to suffer serious and permanent physical injuries including medically documented damage to his immune, endocrine, respiratory and gastrointestinal systems which intern caused severe emotional and psychological distress.

358. Plaintiff's injuries were the foreseeable outcome of Defendants' failure to properly manage and maintain the exterior areas of his home.

359. Defendants were on notice of the health and safety concerns of their actions and/or inactions as Plaintiff had notified them numerous times.

360. The Defendants' negligence caused Plaintiff permanent physical, mental, emotional, and economic damages.

361. Plaintiff reasonably feared and continues to fear for his own safety because of Defendants' negligence in continuing to spray pesticides around his unit to present day.

362. Plaintiff has suffered and continues to suffer physical injuries and psychological damages as a result of the defendants' on-going negligence.

363. Defendants knew of the risks associated with their actions because Plaintiff made numerous requests for accommodation regarding the spraying of pesticides, including asking for advance notice of treatment schedules, use of less environmentally toxic chemicals and not applying the chemicals directly outside his unit.

364. Not only do Defendants both ignore and negligently refuse to grant Plaintiff any accommodations, but additionally, they negligently fail to ensure that the area around Plaintiff's home is maintained and managed in a way that is safe and fail to ensure that Plaintiff is not being exposed to hazardous substances.

365. Defendants know that the pesticides they are applying can and in fact are entering Plaintiff's unit.

366. Defendants had, and continue to have, a duty to notify Plaintiff in advance of the intended days of application of said pesticides and chemicals.

367. Defendants had, and continue to have, a duty to accommodate Plaintiff in accordance with the Federal Fair Housing Act and Federal Fair Housing Amendments Act of 1988.

368. Defendants know that Plaintiff fears for his safety, health and well-being from exposure to the hazardous chemicals they are relentlessly applying.

369. Defendants constantly breach their duty of care to Plaintiff by failing to maintain the premises and failing to ensure that the pesticides and chemicals being used would not cause physical injury to Plaintiff.

370. Defendants also continue breach their duty to Plaintiff when they deny Plaintiff's reasonable requests for accommodation.

371. Defendants know that denials of said reasonable accommodations are causing Plaintiff physical injury and emotional distress, yet nonetheless Defendants continue to disregard all reasonable standards of care.

372. Defendants know and are informed of Plaintiff's health condition and disability.

373. Defendants know and are informed of Plaintiff's numerous accommodation requests. Given the state and nature of Plaintiffs requests, Defendants consciously know that denial of said requests undoubtedly causes physical injury and emotional distress to Plaintiff.

374. The continuous negligent acts, practices and policies described above are the cause of Plaintiff's physical injuries that manifested severe psychological and emotional distress.

## Count 9 – CONTINUOUS INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

375. Plaintiff realleges and incorporates by reference paragraphs 1-374 as though they were fully restated herein.

376. Plaintiff neither requires nor requests this Court to review or overturn any state court rulings. Plaintiff seeks that only Defendants' continuous unlawful conduct and actions be considered and ruled upon.

377. This count arises out of and is solely caused by Defendants' ongoing actions that are independent of any state court ruling. All damages are caused by and directly originate exclusively from Defendants acts and are independent of any other factors not related to Defendants' conduct.

378. Plaintiff does not seek this Court to review the state court default, instead Plaintiff seeks this Court to award damages for Defendants' ongoing acts of intimidation, retaliation and continuous intentional infliction of emotional distress.

379. Defendants engage in a continuous series of vindictive acts designed to inflict repeated injuries both physical and psychological onto Plaintiff and his mother beginning since the early 2000s until present day. This included but was not limited to, constantly harassing Plaintiff into moving out of his home.

380. This campaign of retaliatory harassment consisted of countless unlawful acts and conduct that are part of a concentrated effort and continuous whole to alienate and inflict severe emotional distress onto Plaintiff.

381. Plaintiff cannot pinpoint one specific act that was the main cause of his harm or a specific act that was the first instance of an intentional infliction of emotional distress.

Rather, Plaintiff gradually learned that the acts complained of in this Count were part of a common plan by Defendants to harass him.

382. Plaintiff was injured by the congregation of these acts as a continuous whole, rather than mainly by any one act.

383. Defendants abused, and continue to abuse, their power by subjecting Plaintiff and his mother to belittlement, while making a mockery of Plaintiff's disability through the way they disregarded Plaintiff's needs and how they retaliated against him each time he was taking action in furtherance of his rights.

384. For example, Defendants demanded a retaliatory inspection that was unwarranted from its inception due to the fact that state and federal anti-discrimination law made this issue irrelevant. The inspection demand served no purpose other than harassment, intimidation, humiliation and intentional infliction of emotional distress to make Plaintiff further feel unwanted in the neighborhood and assert dominance over Plaintiff and his mother and bully them into submission. The word inspection, in and of itself, often times denotes a derogatory meaning, and as was plainly visible, that was precisely how Defendants were using it. Given the specific set of facts and circumstances of the situation, and to illustrate an analogous example, Defendants had as much right to demand an inspection as would an employer approaching an employee and demanding that she pull up her skirt if she wants to keep her job.

385. Defendants' conduct is not limited to one or a few independent acts, the conduct was and continues to be a multifaceted scheme of harassment where various methods and modalities of intimidation and abuse act in concert with one another to enhance the effectiveness and accomplish what one or a few acts alone could not do. Defendants agenda of harassment remains in effect and constantly active, Defendants have never once ceased their persecution activities against Plaintiff.

386. Defendants have and continue to intentionally inflict emotional distress by knowingly

and consciously making the decision to spray pesticides not only in the area surrounding Plaintiff's unit, but precisely onto Plaintiff's balcony, his organic medicinal plants, his air conditioning unit, onto and/or through his windows, among the many others ways Defendants' abuse Plaintiff.

387. Defendants' conduct is in response to Plaintiff's exercise of protected Fair Housing rights. Defendants sent Plaintiff threatening and retaliatory letters including a 10 day notice of eviction and demand for possession of property. These letters stated that Defendants' elected to terminate Plaintiff's lease and that he had 10 days to surrender possession of his unit - actions Defendants knew they could not legally do.

388. Although Defendants' knew this was illegal, Plaintiff on the other hand was very vulnerable, being a young disabled person, and did not have sufficient knowledge regarding these kinds of procedures and whether Defendants had any legitimate right to pursue this (they did not). Defendants knowingly used this to instill fear and the feeling of imminent danger into Plaintiff.

389. Defendants did not hesitate to implement various other means of inflicting psychological trauma and emotional distress. Defendants used intimidation in an attempt to gaslight Plaintiff into believing he had no rights, and that it was Plaintiff violating Defendants' rights, not Defendants violating the rights of Plaintiff.

390. Defendants' campaign of extreme and outrageous harassment, along with numerous continuing unlawful conduct began prior to the initiation of Defendants' acts of retaliatory litigation, but also included the initiation and continuation of retaliatory litigation, as well as other continuous harassment.

391. Defendants are utilizing an ongoing multilevel conspiracy to inflict emotional distress onto Plaintiff that entails, and continues to encompass, among others, the pursuit of fabricated lies, selective targeting and fining for fictitious violations of HOA by-laws, threats of litigation, fraudulently abusing the courts to accomplish retaliation under the

guise of litigation, intentionally spraying pesticides near and onto Plaintiffs unit, intentionally discrediting Plaintiff's credibility, deliberately facilitating a hostile living situation for Plaintiff while spreading lies and misinformation, making a mockery of Plaintiff's disability, destroying Plaintiff's therapeutic plants, among many other methods used by Defendants to inflict severe psychological trauma onto Plaintiff.

392. Plaintiff, also was ostracized from his fellow neighbors and his living environment made hostile to him by direct actions of Defendants.

393. Due to this continuous infliction of emotional distress, Plaintiff resorted to certain coping mechanisms by which he attempted to alleviate the pain and suffering he was enduring. The growing of therapeutic plants was one of these methods. Defendant's deliberate destruction of Plaintiff's therapeutic plants in late 2017, caused such intense emotional distress to Plaintiff that he required hospitalization as his health condition went into an acute state of severe exacerbation.

394. Defendants abuse their position of authority over Plaintiff and use it to coerce, intimidate, threaten and interfere with the statutorily protected activities and accommodation requests of Plaintiff and in doing so Defendants are motivated by an intent to cause severe intentional emotional distress to punish Plaintiff.

395. Defendants know that the denials of Plaintiff's accommodation and/or modification requests do in fact cause physical injury and emotional distress.

396. Defendants know that by engaging in this neverending campaign of harassment against Plaintiff and his mother, Plaintiff is forced to face significant financial, physical, and psychological difficulties, as Defendants had been previously informed of the severe nature of Plaintiff's medical conditions and Plaintiff's vulnerability to such actions.

397. Plaintiff's vulnerability to Defendants actions makes the proposition that much more enticing for Defendants and they do not for a moment hesitate at the opportunity to abuse

Plaintiff via a plethora of illegal, vindictive and sadistic methods, relying on the knowledge that Plaintiff's fragile state ensures that their actions inflict the greatest amount of damage, and allow them to escape the consequences of their conduct. Defendants tormented Plaintiff when he was at his weakest, most indefensible condition. Defendants viewed Plaintiff as being too weak to defend himself, and of that they took advantage.

398. Defendants' numerous acts of outrageous conduct are a manifestation of their policy and practice that discriminates on the basis of disability and form a pattern and practice of systemic discrimination and psychological abuse. Defendants' policies and practices not only encourage discrimination, but also foster the spread of harassment, hatred and intentional infliction of emotional distress.

399. Defendants were and continue to be in a position of power and authority over Plaintiff, and their extreme conduct would cause any person of ordinary sensibilities to suffer grave emotional distress. Additionally, Defendants know their objectives are not legitimate and they know that Plaintiff, being a very young person with a disability, and limited financial resources, is especially susceptible to Defendants' infliction of emotional distress.

400. Plaintiff is forced to endure exposure to toxic pesticides against his will and protests at the hands of Defendants. The harm caused by Defendants' continuous applications of pesticides and forcing Plaintiff to maintain carpeting far outweighed any reasonable benefit to an extent beyond that which an ordinary person would contemplate.

401. Defendants have a continuing pattern and practice of inflicting emotional distress against those whom they deem to be disruptive to their personal agenda. This habit of Defendants has in fact caused medically documented emotional distress to Plaintiff.

402. Defendants relentlessly pursue fabricated lies and use them as ammunition against Plaintiff with the intent of causing harm and distress.

403. Defendants' acts of continuous retaliation and harassment against Plaintiff caused and continue to cause extreme stress, fear, and an accelerated decline in his health, requiring Plaintiff to undergo extensive treatment for his psychological and emotional injuries.

404. Plaintiff has been living in fear of uncertainty, fear of developing further health complications, fear of Defendants' unpredictable retaliation, fear of becoming homeless, and has received unwarranted threats from Defendants ranging from notices and fines for non-existent or trivial violations to numerous acts of vandalism of personal property, as well as verbal harassment accompanied by threats of physical harm.

405. Defendants' on-going conduct is the cause of Plaintiff's emotional distress.

406. Defendants' conduct was and continues to be a calculated multilevel plan that utilizes various complementary methods and elements that are designed to work in unison, synergistically with one another, to cause Plaintiff the maximum amount of intentional physical and emotional harm.

407. Plaintiff suffers and is being marginalized, exploited and constantly threatened by Defendants' who take a satisfying pleasure knowing that Plaintiff is suffering.

408. Defendants know that deliberate spraying of pesticides around Plaintiff's unit exacerbates his physical disability whereby causing severe emotional distress and psychological injuries.

409. Despite Plaintiff's attempts to stop Defendants' unlawful actions and harassment, and despite his repeated attempts to tell Defendants that their conduct was inappropriate, damaging and harmful, Defendants continued their behavior.

410. Based on the extreme and outrageous conduct outlined above, Defendants intentionally and recklessly intended to cause Plaintiff to suffer severe emotional distress, or should

have known that such outrageous conduct would cause Plaintiff to suffer from severe emotional distress.

411. These actions, and inactions, by the Defendants, amount to willful and wanton misconduct and/or a reckless disregard for the health and safety of Plaintiff in that Defendants know that Plaintiff had made repeated requests on numerous occasions and yet Defendants exhibit gross indifference and chose to inflict severe psychological trauma onto Plaintiff.

412. Defendants, wielding power and a position of authority, threatened circumstances which created, in Plaintiff's mind, a well-founded fear of imminent peril, caused by Defendants' ability to commit retaliation and harm onto Plaintiff.

413. At no time did Plaintiff ever consent to be exposed to hazardous chemicals or have his health and safety placed in danger. At no time was any of the intentional and unlawful conduct set forth herein justified.

414. As a further direct and proximate result of Defendants' orchestrated campaign of abuse, retaliation and unlawful conduct, Plaintiff has suffered severe emotional distress and has experienced many hardships. He has experienced severe mental anguish, depression, emotional distress and a hostile living environment and will continue to suffer the same in the future; he has suffered a loss of enjoyment of a normal life as a consequence of his emotional injuries and he has lost his ability to engage in normal activities.

415. Plaintiff suffered and continues to suffer physical injuries as well as psychological injuries from Defendants' continuous intentional conduct.

416. Plaintiff has suffered and continues to suffer physical manifestations of fear and stress.

417. The emotional distress Plaintiff suffers has been medically diagnosed and is medically significant and has required Plaintiff to seek medical care.

418. Plaintiff has been and continues to be under intensive and extensive medical treatment.

419. The emotional distress Plaintiff suffers at the hands of Defendants has been so severe that it placed Plaintiff's life in danger.

420. Defendants intended to cause or recklessly or consciously disregarded the probability of causing emotional distress.

421. Defendants' continuous unlawful conduct actually and proximately is causing the Plaintiff's injuries, damages and severe emotional distress. Defendants' intentional conduct warrants an award of punitive damages.

## Count 10 – FAIR HOUSING VIOLATIONS

422. Plaintiff realleges and incorporates by reference the preceding paragraphs as though they were fully restated herein.

423. Plaintiff neither requires nor requests this Court to review or overturn any state court rulings. Plaintiff seeks that only Defendants' continuous unlawful conduct and actions be considered and ruled upon.

424. This count arises out of and is solely caused by Defendants' ongoing actions that are independent of any state court ruling. All damages are caused by and directly originate exclusively from Defendants acts and are independent of any other factors not related to Defendants' conduct.

425. Plaintiff does not seek this Court to review the state court default, instead Plaintiff seeks this Court to award damages for Defendants' ongoing acts of intimidation, retaliation and continuous intentional infliction of emotional distress.

426. Defendants discriminated against Mr. Kraszinski, a person with disabilities, in the use and availability of a dwelling by denying plaintiff the opportunity to enjoy the use of his unit because of defendants' refusal to limit their of pesticides near plaintiff's unit as required because of his disabilities, in violation of 42 U.S.C. § 3604(f).

427. Defendants discriminated against Mr. Kraszinski, a person with disabilities, in the terms, conditions, or privileges of the available use of a dwelling because of his disabilities, in violation of 42 U.S.C. § 3604(f)(2)(A).

428. Defendants refused to make a reasonable accommodation in rules, policies, practices, or services, when such an accommodation was necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C.§ 3604(f)(3)(B).

429. Defendants continually spray pesticides on plaintiff's balcony and near his unit in retaliation for plaintiff's exercise of his right to a reasonable accommodation in the form of toxin-free living space, in violation of 42 U.S.C. § 3617.

430. Mr. Kraszinski is an aggrieved person as defined in 42 U.S.C. § 3602(i) and has suffered injuries as a result of Defendants' actions.

431. Defendants' discriminatory actions were intentional, willful, and taken in disregard of the rights of Mr. Kraszinski.

### PRAYER FOR RELIEF

WHEREFORE, **Christopher Kraszinski,** Plaintiff  respectfully requests that this Honorable Court review his claims and enter orders that:

A.  Defendants be served by the U.S. Marshall, or other competent entity legally authorized to serve process in the State of Illinois, and be ordered to file an answer within the time allotted by law.

B.  Judgment be rendered in favor of Plaintiff and against Defendants on all counts asserted herein.

C.  Declare that Defendants' actions violate the Fair Housing Act, the Federal Fair Housing Amendments Act of 1988 and its implementing regulations;

D.  Enjoin Defendants, their officers, employees, agents, successors and all other persons in active concert or participation with it, from enforcing the Defendants' rules, practices, and/or policies that unfairly infringe upon the rights of reasonable enjoyment of persons with disabilities;

E.  Enjoin Defendants, their officers, employees, agents, successors and all other persons in active concert or participation with it, from enforcing the Defendants' rules in a manner that discriminates because of disability in violation of the Fair Housing Act.

F.  Order Defendants to take all affirmative steps to ensure its compliance with the Fair Housing Act and Federal law, including steps necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate to the extent practicable the effects of its unlawful housing practices as described herein;

G.  Order Defendants to take all affirmative steps to restore, as nearly as practicable, the victims of the Defendants' unlawful practices to the position they would have been in but for the Defendants' discriminatory conduct;

H.  Award monetary damages, pursuant to the FHA, 42 U.S.C. § 3614(d)(1)(B), and its implementing regulation, 28 C.F.R. Part 35, to all aggrieved persons.

I. Plaintiff be awarded compensatory damages for his physical injuries, pain and suffering and mental anguish.

J. Plaintiff be awarded punitive damages against Defendants.

K. Plaintiff be awarded reasonable expenses incurred in this litigation, including his reasonable attorney's fees, expert fees, costs of suit and other reasonable litigation expenses, pursuant to 42 U.S.C., Section 1988(b) and (c).

L. Assess a civil penalty against the Defendants in an amount authorized by 42 U.S.C. § 3614(d)(1)(C) to vindicate the public interest.

M. Plaintiff receive any such additional relief as the interests of justice may require and any other relief to which he may be entitled.

N. Plaintiff be granted a jury trial in this matter.

Respectfully submitted
**Christopher Kraszinski**, Plaintiff

s/ Alfred D. Ivy, III
Alfred D. Ivy, III - Attorney for Plaintiff

s/ Jay Kumar
Jay Kumar - Attorney for Plaintiff

| Alfred D. Ivy, III, #6277701 | Jay Kumar, #60100 |
|---|---|
| Attorney for Plaintiff | Jay Kumar Law |
| 159 Lincoln Square | Attorney for Plaintiff |
| 300 S. Broadway Ave. | 208 S. Jefferson St. #204 |
| Urbana, Illinois 61801 | Chicago, Illinois 60661 |
| (217) 480-4893 cell | (312)-767-7903 |
| lawmba1@gmail.com | jay@jaykumarlaw.com |